No. 93,556

In the Matter of the Estate of DAVID E. SAUDER, Deceased.
(156 P.3d 1204)

Review of the judgment of the Court of Appeals in an unpublished opinion filed December 16, 2005.

Opinion filed April 27, 2007.

*Bryan K. Joy*, of Joy Law Office, P.A., of Burlington, argued the cause and was on the brief for appellants/cross-appellees Michelle Thompson and Alexandria Cox, coadministrators.

*Stephen J. Smith*, of Coombs, Hull & Smith, L.L.C., of Burlington, argued the cause and was on the brief for appellees/cross-appellants Gene Sauder and Spencer West.

The opinion of the court was delivered by

LUCKERT, J.: The coadministrators of the Estate of David E. Sauder (Estate) seek a determination of the effect of the decedent's written and oral sharecrop farm leases upon the ownership of crops that the decedent had planted as a sharecrop tenant but had not harvested at the time of his death and of crops planted, grown, and harvested after his death on property which the decedent had prepared for planting. The coadministrators contend that several oral leases and one written lease under which David farmed the property of others did not terminate upon David's death, entitling the Estate to ownership of the tenant's share of all crops on the property. Gene Sauder, one of the landlords who was also David's father, and Spencer West, the person who harvested the growing crops and planted new crops on the leased properties, contend farm leases, whether written or oral, are personal service contracts that do not survive the death of the tenant. Alternatively, they contend the common law relating to termination of commercial leases, general contract law, and equity do not allow the Estate's claim to the crops.

## FACTS

On January 1, 1999, David executed a written "Farm Lease Agreement" in which he obtained the right to occupy property

owned by Gene in exchange for rental payments in the amount of one-half of all harvested crops. David and Gene agreed to each pay one-half the expenses for fertilizer and chemicals. As conditions of the lease, David agreed to "cultivate, fertilize and manage the farm in a husbandlike manner" and to "insure that all crops are cut, threshed, combined, or husked, and otherwise properly cared for at all times." The lease also provided that David would lease farm equipment from Gene and make an annual payment in addition to the crop sharing payments. The lease was for 12 months ending December 31, 1999.

Although the written lease was not renewed, David was still farming his father's land when he died intestate on March 30, 2004. At the time of his death, David had approximately 200 acres of winter wheat growing on Gene's land, and David was preparing other acreage for corn and beans. Within a week of his death and before estate administrators had been appointed, Gene and Spencer—Gene's grandson and David's nephew—planted corn on 302 acres that had been subject to the 1999 written lease.

At the time of his death, David also farmed approximately 460 acres under oral leases with several other landlords. Under these agreements, David was to receive two-thirds of the crops and the landlords one-third. David had not planted any crops on the property subject to the oral leases. However, the previous fall, David had worked the land and applied fertilizer. Within a short time of David's death and before estate administrators were appointed, Gene negotiated with these landlords to have Spencer lease these properties. Spencer borrowed money for seed and planted corn on the properties subject to the oral leases.

On April 30, 2004, David's ex-wife, Michelle Thompson, and his daughter, Alexandria Cox, were appointed coadministrators of the Estate. On May 28 and July 6, 2004, Cox signed United States Department of Agriculture (USDA) contracts which listed Spencer as an owner or operator of the leased premises.

After borrowing money, Spencer planted soybeans on the balance of the acreage David had leased from Gene and the other landlords. The beans were planted during May, June, and July, with the last planted on July 13, 2004.

Gene and Spencer also harvested the winter wheat growing on Gene's property. They delivered one-half of the crop for the benefit of the Estate and made a claim against the Estate for the custom harvesting expenses. The Estate did not object to the claim for custom harvesting or the splitting of the proceeds from the wheat.

On July 15, 2004, the coadministrators informed Gene and Spencer that the Estate was also claiming the corn and bean crops. Prior to this date, the coadministrators had neither authorized nor prohibited Gene and Spencer from farming David's leaseholds. Evidence indicates that the coadministrators were aware Spencer was farming the property. Specifically, there was evidence that Cox worked at the bank from which Spencer borrowed money to buy seed for the land, signed the USDA forms necessary for the crops to be farmed, and knew of the plans for harvesting the wheat and planting crops.

In an apparent response to the Estate's assertion of a right to proceeds from the corn and bean crops, Gene filed a petition in the estate proceedings. He requested that the district court "construe what farm lease rights, if any, the Estate of David E. Sauder, deceased, may possess and claim against the 2004 corn and bean crops planted by Petitioner and his assigns . . . ." Spencer joined him on the trial brief in which they requested a determination that the leases terminated upon David's death. (The landowners are not parties; rather, the issues involved in this appeal arise because Gene and Spencer object to the Estate's claim to the tenant's share of proceeds under these sharecrop farm leases).

The district court entered judgment against the Estate on Gene's petition, concluding that the Estate could not enforce the farm leases for three reasons:

"First, the agricultural leases are personal services contracts which terminate on the death of the tenant. Second, the Estate failed to obtain approval from the probate court to continue the farming lease under K.S.A. 59-1402; and so the Estate lacks authority to enforce the leases. Third, the Estate failed to act under circumstances which resulted in injury to Spencer West and the Estate is prevented from benefitting under the equitable doctrine of laches."

The Estate appealed, challenging each of these findings.

In its unanimous *per curiam* opinion, a Court of Appeals panel held that the district court erred in concluding the written lease terminated at David's death. *In re Estate of Sauder*, No. 93,556, unpublished opinion filed December 16, 2005. The panel relied upon a disclaimer which stated that "[t]his lease is not intended nor shall it be construed to be an employment contract" to conclude the parties did not intend that the contract be one for personal services. The panel further concluded that "it is well established that upon the death of a lessee, the personal representative assumes the rights and obligations of the decedent by operation of law." Consequently, the panel held the written agreement was enforceable by the Estate. *Sauder*, slip op. at 6.

Nevertheless, in discussing the oral leases, the Court of Appeals noted that there was policy support in Kansas for the principle that "agricultural leases are personal in nature" and further agreed that the principle had "received general acceptance" as the "majority rule." *Sauder*, slip op. at 8. However, the court ultimately did not opine whether these oral farm leases were personal services contracts that terminated on David's death. The Court of Appeals instead determined that David's interest, "if any," in the oral leases terminated either at the end of the lease term in February or at his death, and, therefore, the Estate had no interest in crops growing on third-party land; the crops were subject to the renegotiated oral leases. *Sauder*, slip op. at 9.

The Court of Appeals also held that the district court erred in concluding that court approval under K.S.A. 59-1402 was a necessary condition precedent to the Estate's authority to conduct farming operations under the leases. That statute requires the probate court's authority for the personal representative to operate any business of a decedent. K.S.A. 59-1402. The Court of Appeals determined that K.S.A. 59-1402 had no application to the leasehold interests of a decedent. *Sauder*, slip op. at 10-11. The parties did not seek review of this portion of the decision and, therefore, this issue is not before this court.

Finally, the Court of Appeals affirmed the district court's application of laches as to the soybean crop planted after the coadministrators of the Estate had been appointed; it agreed that the Estate

was barred from any claims to that crop because substantial evidence supported the district court's finding that the Estate "sat back and watched the [crops] grow." *Sauder*, slip op. at 13. However, as to the corn crop planted on Gene's property, the Court of Appeals reversed the district court's application of laches because the corn was planted "well in advance of the appointment of the coadministrators. Under the circumstances presented, it was unreasonable to expect action well in advance of appointment in order to protect the interests of the Estate." *Sauder*, slip op. at 13-14. Consistent with this determination, the Court of Appeals remanded the case to the district court to determine the extent of the Estate's interest in the corn crop, offset by reasonable costs and the value of services provided by Gene and Spencer. *Sauder*, slip op. at 14-15.

The Estate petitions for review of the Court of Appeals' rulings that the oral leases were personal services contracts that terminated on David's death and that laches barred the Estate's claim against the soybean crop planted on Gene's land.

On cross-petition, Gene and Spencer seek review of the Court of Appeals' decision that the written lease between Gene and David did not terminate with David's death. They also argue that if the doctrine of laches applies, it should have been applied to bar the Estate's claim against the corn crop. Finally, they seek clarification of the Court of Appeals' opinion on the issue of whether the oral leases were personal services contracts that terminated on David's death.

This court granted review, pursuant to K.S.A. 2006 Supp. 22-3602(e) and K.S.A. 20-3018(b).

## ANALYSIS

### I. Did the Contracts Terminate Upon David's Death?

#### A. Standard of Review.

The questions of whether written or oral farm leases continue after the death of the lessee and whether a contract is a personal services contract that terminates on the death of the lessee are questions of law, as is the construction of the written agricultural

lease at issue here. As such, the district court's determinations of these issues are subject to de novo review by this court. See *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001).

### B. Holdover Status.

A threshold question is whether there were valid leases through which the Estate can claim a right to farm the various properties. In proceedings before the district court, the parties did not dispute that there were leases in effect at the time of David's death; thus, the district court did not discuss whether the leases were valid. However, the Court of Appeals panel did discuss the issue, and the analysis was critical to the panel's treatment of the leases, especially the oral leases. Therefore, we begin our review with the question of whether valid leases were in force at the time of David's death.

Regarding the written lease, the panel wrote:

"Although the district court did not address the continued vitality of the 1999 written lease agreement during 2004, it is apparent that David had occupied the premises on a continuous basis since 1999 and that in the absence of timely written notice of termination, he became a tenant from year to year after expiration of the fixed term by operation of law." *Sauder,* slip op. at 5.

The parties do not dispute this conclusion. Indeed, K.S.A. 58-2506(d) provides a farm tenant "becomes a tenant from year-to-year by occupying the premises after the expiration of the term in a written lease." Additionally, year-to-year tenancies following a holdover from a written lease are generally extended or renewed on the same terms as the original lease. See *Kearns v. Clark,* 159 Kan. 353, 355, 154 P.2d 479 (1945). Hence, the lease between David and Gene was in effect on the date of David's death on the same terms and conditions as in the original contract.

The panel reached a different conclusion regarding the oral leases, however, deciding that the leases terminated in February before David's death. The panel applied the provisions of K.S.A. 58-2506(a), which provides in part:

"Except as may be otherwise provided by this section or by a written lease signed by the parties thereto, in cases of tenants occupying and cultivating farms or occupying or leasing pastureland, the notice to terminate such a farm or pas-

tureland tenancy must be given in writing at least 30 days prior to March 1 and must fix the termination of the tenancy to take place on March 1."

The Estate argues that because no notice of termination was given by either party, the oral leases were continued beginning March 1 and were in effect on March 30, the date of David's death. The panel questioned the "direct applicability of this statute" because "[n]either party contends that David was 'occupying' the leased premises pursuant to these oral leases at the time of his death or at anytime within 30 days of March 1." *Sauder*, slip op. at 7. After additional discussion of the nature of personal contracts and cases from other jurisdictions, the panel held:

"Based upon the unique facts of this case, including no apparent 'occupying' by the tenant during the statutory period for notice of termination and the re-negotiations of leases by lessors who desired to provide for continued farming operations on their lands, we hold that David's interests, if any, in the oral agricultural leases, either terminated at the end of the lease term in February or upon his March 2004 death." *Sauder*, slip op. at 9.

Contrary to the panel's conclusion, the record reflects that both parties acknowledged that David was occupying the property at the time of his death. The Estate's case is premised upon occupation and continuation of the leases, and Gene testified that David was farming all the property at issue. Additionally, there was evidence that David had prepared the ground for corn and beans and applied dry fertilizer in the fall of 2003. The panel did not discuss this evidence, nor did it explain its construction of the phrase "occupying and cultivating."

The phrase "occupying and cultivating" is not defined in the statute. However, guidance as to the intended meaning of the phrase is provided through two other statutory provisions relating to the timing and effect of notices of termination. We must construe these provisions along with K.S.A. 58-2506 to determine the legislature's intent. See *Pieren-Abbott v. Kansas Dept. of Revenue*, 279 Kan. 83, 89, 106 P.3d 492 (2005) (several provisions of an act in pari materia must be construed together when determining legislative intent and reconciling provisions). First, K.S.A. 58-2506(b) provides that the termination date of leases will be extended to August 1 if a fall seeded grain crop "has been prepared in confor-

mance with normal practices in the area." Second, pursuant to K.S.A. 58-2506a, if a landlord gives notice of termination of a lease, a tenant who "has performed customary tillage practices or has applied or furnished fertilizers, herbicides or pest control substances" but not planted crops is entitled to payment for the "fair and reasonable value of the services furnished and the fertilizers, herbicides or pest control substances furnished."

Thus, these provisions vest tenants with certain rights if a tenant performs one or more of the listed tasks. From these provisions, we discern a legislative intent that one who leases farm property and performs customary tillage practices, plants crops, or applies fertilizers, herbicides, or pest control is occupying and cultivating the leased premises within the meaning of the notice requirements of K.S.A. 58-2506 and K.S.A. 58-2506a. Because David had worked and applied fertilizer to the property that was subject to the oral leases, David was occupying and cultivating the property. Consequently, the leases were in effect at the time of David's death because no notice of termination was provided by any landlord or David before March 1, 2004.

## C. Are the Oral Leases Personal Services Contracts?

Alternatively, the panel concluded the oral contracts terminated on the date of David's death. *Sauder*, slip op. at 7-9. The rationale for this conclusion appears to be that the contracts were personal in nature. The Estate, on review, asks us to reverse this conclusion.

The question of whether a sharecrop farm lease is a personal services contract is a matter of first impression in Kansas. The issue was discussed but not decided in *Jinnings v. Amend*, 101 Kan. 130, 132, 165 Pac. 845 (1917). In *Jinnings*, a sharecropping tenant had broken sod on 500 acres and plowed 400 acres of cultivated land but had not sowed a crop when he was arrested and placed in jail. Within a few days of the tenant's arrest, the landlords took possession of the property and would not return it to the tenant when he was paroled. The tenant argued that the parties' written agreement did not contain an express provision regarding termination of the tenancy and, as a result, the lease did not expire until the end of the 3-year lease term. He sought to characterize the lease as a

standard property agreement. The landlords argued that the "croppers" agreement for sharing proceeds from crops and for receipts for pasturing cattle meant that the agreement was one for personal services. The court's opinion included language suggesting the contract was a personal services contract, stating: "His personal services were engaged; his skill as a farmer was involved; he had no power of substitution or subletting." 101 Kan. at 132. However, ultimately, the court declined to answer the question of whether the contract was one for personal services, concluding: "We do not consider it necessary to decide what expression most fitly describes the relationship into which the parties entered." 101 Kan. at 132.

The parties have cited no other Kansas cases addressing the question directly. However, several basic principles guide our consideration of the issue. Generally, " 'the obligations of a lessee under the contract [pass] on his death to his personal representative who assumes in his fiduciary capacity the performance of the contract in the same manner that its performances could have been demanded of the lessee.' [Citation omitted]." *Olson v. Frazer*, 154 Kan. 310, 312, 118 P.2d 505 (1941).

However, where the existence of a particular person is necessary for the performance of a contractual duty, the death of that person, or his or her loss of capacity to perform the duty, discharges the obligor's duty to perform. See Restatement (Second) of Contracts § 262 (1979). Generally referred to as personal services contracts, these contracts are not assignable, do not survive without the consent of both parties, and terminate automatically upon the death of the party performing the unique service. See 1 Friedman on Leases § 2:1.7 (5th ed. 2004); 29 Williston on Contracts § 74:27 (4th ed. 2003); 30 Williston on Contracts § 77:72 (4th ed. 2004).

The rationale for considering sharecrop farm lease agreements to be personal services contracts was explained in *Ames v. Sayler*, 267 Ill. App. 3d 672, 642 N.E.2d 1340 (1994). In the case, the estate of a deceased farm tenant sought a determination that it could continue to farm the landowners' land under the terms of decedent's oral lease, and the landowners filed a counterclaim. The Illinois appellate court recognized the common-law rule that a farm

lease is a personal services contract that terminates on the tenant's death, stating that

"a farm tenancy is an estate in land, but it is more than that. A farm tenant not only has possession of land, he is expected to perform services which require skill and judgment. A farm landlord usually does not view tenants as interchangeable, and usually chooses to lease his farm only to those in whom he has particular confidence. No satisfactory reason appears why a farm owner should be forced to accept a substitute, if the farm owner can be said to have entered into a 'tenancy,' but not if what is basically the same relationship is labeled a personal services contract. Farm tenancies and personal services contracts are not mutually exclusive categories. Farm tenancies in fact are more readily viewed as personal services contracts than are employee or custom hire relationships. A farm owner places more trust in a tenant than he does in an employee or a custom hire operator. The question in this case should be answered by determining whether the contract between the farm owner and the worker is a personal services contract." 267 Ill. App. 3d at 675-76.

See *In re Estate of Long*, 311 Ill. App. 3d 959, 964, 726 N.E.2d 187 (2000).

Other states have reached the same result upon similar rationales. *E.g.*, *Crump v. Tolbert*, 210 Ark. 920, 924, 198 S.W.2d 518 (1946) (lease of land on shares, including use of buildings, farm implements, stock, and other personal property is personal contract because "the amount to be received by the lessor and the care of the property depend on the character, industry, and skill of the lessee"); *Randall v. Chubb*, 46 Mich. 311, 312, 9 N.W. 429 (1881) (farm lease is personal services contract because "[t]he rent or share which the [lessor] would receive, must depend very much upon the character of the lessee"); *Greeson v. Byrd*, 54 N.C. App. 681, 682, 284 S.E.2d 195 (1981) ("A farm lease [sharecropping] agreement is personal in nature and thus non-assignable without the landlord's consent since the landlord's receipts under the contract are directly related to the lessee's skill and industry."); *Tipton v. Martzell*, 21 Wash. 273, 276, 57 Pac. 806 (1899) ("[T]he landlord depends on the character and skill of the lessee, and [a contract of this nature] would seem to be personal and not assignable."); see 9 Corbin on Contracts § 865 (Interim ed. 2002). At least one jurisdiction has held that farm leases are not personal services contracts. *Walker's Estate*, 6 Pa. C.C. 515 (1889). However, the ma-

jority of jurisdictions have noted that considerable skill and judgment are required in farming and a landlord's confidence in the lessee is personal and not assignable, transferable, or inheritable.

In response to this line of authority, the Estate argues, in part, that it does not matter what common-law doctrines apply because the Kansas Legislature has prescribed the time and method for farm lease terminations through K.S.A. 58-2506, requiring that "the notice to terminate . . . must be given in writing at least 30 days prior to March 1 and must fix the termination of the tenancy to take place on March 1."

In support of its argument, the Estate cites *Read v. Estate of Mincks*, 176 N.W.2d 192 (Iowa 1970). In *Reed*, the Iowa Supreme Court concluded that the common-law rule that a share crop farm lease was ordinarily regarded as a personal services contract, which does not survive the lessee's death, was "materially restricted" by an Iowa statute that required several month's written notice to terminate a farm tenancy. 176 N.W.2d at 193.

However, the Illinois court in *Ames* reached the opposite conclusion. Considering a similar statute that required 4 months' notice of termination before March 1, the Illinois appellate court in *Ames* determined the statute did not apply when there was a death, stating:

"In any event we reject the view that the question presented in this case is answered (or even addressed) by the four-month statute, or by considering whether plaintiff was a tenant. The four-month statute deals with termination at the end of the year, not termination upon the death of one of the parties." 267 Ill. App. 3d at 675.

The court then engaged in a lengthy analysis of the nature of personal services required, but at the conclusion of that discussion again noted:

"We do not question there was a landlord-tenant relationship in this case and that the four-month notice statute would apply in the event an attempt had been made to terminate this lease at the end of the year. As we have explained above, however, that is not relevant on this appeal. What is important is whether the parties entered into this contract upon the understanding that it would be performed by decedent and no others. The trial court made that finding, that this contract was

a personal services contract, and that finding is supported by the evidence." 267 Ill. App. 3d at 677.

The Estate argues that the *Ames* court's analysis cannot be applied in Kansas because of another statute, K.S.A. 58-2519, which states: "Executors and administrators shall have the same remedies to recover rents, and be subject to the same liabilities to pay them, as their testators and intestates." Without citing to K.S.A. 58-2519 as authority, this court applied the general rule of this provision to the lease of a business building. The *Olson* court determined that upon a lessee's death, the lessee's obligations pass to his or her personal representative who assumes in a "fiduciary capacity the performance of the contract in the same manner that its performances could have been demanded of the lessee." 154 Kan. at 312.

Even though K.S.A. 58-2519 is a general statute that does not specifically refer to farm leases and *Olson* related to the lease of a business building, there is no indication the legislature intended a different rule for farm leases. Article 25 of Chapter 58, K.S.A. 58-2501 *et seq.*, which deals generally with nonresidential landlord and tenant relationships, is sprinkled with other provisions creating special rules for farm sharecrop leaseholds. Yet, the Kansas Legislature did not provide for special rules relating to executors and administrators assuming responsibilities with farm tenancies.

Furthermore, commentators suggest K.S.A. 58-2519 applies to farm leases. Professor James Wadley, of Washburn University School of Law, and Sam Brownback, former Kansas Secretary of Agriculture, in their treatise on Kansas agricultural law, state: "If either the landowner or tenant dies while a farm lease is in effect, the decedent's executor or administrator is required to comply with the terms of the lease as if the decedent or tenant were still alive." Brownback and Wadley, Kansas Agricultural Law, pp. 193-94 (1994). In support of this statement, the authors cite *Jewell v. McFarland*, 141 Kan. 40, 40 P.2d 330 (1935), another case related to the lease of a business building. The decision in *Jewell* is based, in part, on the predecessors to K.S.A. 58-2519, G.S. 1869, ch. 55, sec. 19; R.S. 1923, 67-519; and G.S. 1949, 67-519, which were "simply a codification of the common law." Hannah, *The Legal*

*Status of Tenant Farmers in Kansas*, 7 U. Kan. L. Rev. 295, 301 (1959).

We, therefore, conclude that under K.S.A. 58-2519 a lease, including an agricultural sharecrop lease, continues in effect upon the death of the tenant unless the parties have contracted otherwise, and the executor or administrator of the lessee's estate has the fiduciary obligation to see that the lessee's obligations are met. Therefore, the oral leases did not terminate upon David's death.

### D. *Was the Written Lease Agreement a Personal Services Contract?*

However, a different conclusion could apply to the written lease in this case because the statutory requirements regarding termination do not apply if the parties to a written contract agree to other terms. (K.S.A. 58-2506[a] begins: "Except as may be otherwise provided . . . by a written lease signed by the parties thereto . . . ."). Furthermore, "public policy encourages the freedom to contract, which should not be interfered with lightly." *Miller v. Foulston, Siefkin, Powers & Eberhardt*, 246 Kan. 450, 463, 790 P.2d 404 (1990). Consequently, nothing should prohibit parties to a contract from agreeing to terms which would take the arrangement outside the statutory rule that a lease is binding upon the heirs of the parties; the parties could agree that a written contract will terminate immediately upon the lessee's death. We, therefore, must construe the contract between Gene and David to determine whether the written contract continued upon David's death.

When courts are called upon to interpret a written instrument, the primary rule is to ascertain the intent of the parties. *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 324, 961 P.2d 1213 (1998). As a general rule, if the language of the written instrument is clear, there is no room for rules of construction. Courts must ascertain the meaning of a written agreement by considering all pertinent provisions and not by the critical analysis of a single or isolated provision. 265 Kan. 371, Syl. ¶¶ 2, 3.

Ideally, parties to a farm lease would clearly express their intent regarding the effect of the death of a tenant, the issue we have in this case, or the death of a landlord. Indeed, we would encourage

scriveners of such agreements to include a provision expressing the parties' intent. However, in this case, there was no such clear expression. We, therefore, must examine the written lease to determine the effect of various terms which are less clear expressions of the parties' intent.

The Court of Appeals, in rejecting the contention the written farm lease between David and Gene was a personal services contract, focused upon paragraph 12, which stated, in part: "This lease is not intended nor shall it be construed to be an employment contract, partnership, joint venture, or profit-sharing enterprise between the Landlord and the Tenant." Because "the lease expressly disclaimed any intention to create an employment contract," the panel concluded the contract was not one for personal services. *Sauder*, slip op. at 6. The panel cited no authority for its conclusion that a personal services contract must be an employment contract. Furthermore, no party has argued that the agreement constituted an employment contract; clearly, the agreement indicates that it is not to be so construed.

Parties to crop share agreements have been determined to have a variety of relationships, including "cropper" and employer, landlord and tenant, joint venture participants, partners, and tenants in common. See 21A Am. Jur. 2d, Crops §§ 45, 46, 55-62. Paragraph 12 clarifies the parties' intent that the contract establishes a relationship between Gene and David as landlord and tenant and not one of the other types of relationships. When an employment or "cropper" relationship exists, the contract is usually deemed to be a personal services contract. However, even when the contract is viewed as one between a landlord and a tenant, many jurisdictions have found the cropshare lease to be one involving personal services. 21A Am. Jur. 2d, Crops § 53.

Contrary to the panel's analysis, we conclude that paragraph 12 does not mean that the written agreement could not be construed as a contract for the performance of personal services independent of an employment relationship.

The Court of Appeals panel also considered the district court's conclusion that paragraph 12 was inconsistent with paragraph 4(d). Paragraph 4(d) of the agreement provided that the tenant would

"not assign this lease nor sublet the premises." Although the provision did not contain language governing assignment upon the death of the lessee, the district court concluded that the parties clearly stated their intent that the contract be a personal services contract subject to the discretion of the landlord. The panel rejected this conclusion based upon its reading of a different provision, paragraph 15, which the panel viewed as evidence of the parties' intent that the lease survive David's death. *Sauder*, slip op. at 5-6.

Paragraph 15 directed that the agreement "shall apply to and be binding upon the heirs, successors, executors, and administrators of the parties hereto." The Court of Appeals panel concluded this provision was not inconsistent with the nonassignment clause of paragraph 4(d), apparently because the circumstances surrounding an administrator assuming the duties and obligations of a decedent under a contract is not an assignment or sublease. The Court of Appeals' interpretation is supported by the Illinois appellate court's decision in *Ames*, 267 Ill. App. 3d at 677, in which the court noted that similar language could remove the lease from operation of the common-law rule.

We conclude this contractual language had the same effect as K.S.A. 58-2519. When parties to a sharecrop farm lease agree that the terms of the contract "shall apply to and be binding upon the heirs, successors, executors, and administrators of the parties," they express an intent that the contract is not a personal services contract. Therefore, under such a contract, the deceased lessee's estate has a fiduciary obligation to perform the contract in the same manner that performance could have been demanded of the decedent. Because of this provision in the contract between Gene and David, the contract did not terminate upon David's death.

## II. Did the Leases Continue Until a Notice of Termination Was Served?

The Estate suggests that if we reverse the Court of Appeals' and district court's holdings that the leases terminated upon David's death, the Estate had a right to a share of the crops because, under terms of the written lease and under Kansas statutes, no notices to

terminate could be given until the end of the lease terms and no notices had been given. This argument, however, ignores other provisions of the written contract and some general principles of contract and landlord-tenant law that were not discussed by the lower courts, in large part, because those courts concluded the contracts, or some of them, had terminated on David's death.

*A. Standard of Review.*

Determination of this issue as it relates to the written lease requires construction of the lease; our review is, therefore, de novo. *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001). Our determination of the issue as it relates to the oral leases requires that we construe relevant statutes; our review of statutes is unlimited. See *Cooper v. Werholtz*, 277 Kan. 250, 252, 83 P.3d 1212 (2004).

*B. Termination of Written Contract.*

Neither the district court nor the Court of Appeals discussed the possible impact of paragraph 9 of the written lease between Gene and David. Paragraph 9 provided:

"[I]f the tenant shall fail to keep and perform any of the covenants, agreements, or conditions of this lease, the Landlord may re-enter and take possession of the premises without working a forfeiture of the rents to be paid by the Tenant for the full term of this lease. At his election, the Landlord may terminate this lease, or without terminating, re-let the premises or any part thereof for the remainder of the lease term and may recover any deficiency from the Tenant."

Paragraph 4 of the lease agreement contained several broadly worded obligations of the tenant, including the obligations to "cultivate, fertilize and manage the farm in a husbandlike manner" and "to take good care of all growing . . . crops." By operation of the provisions of paragraph 9, if the tenant, whether the tenant be David or his heirs, failed to meet these conditions, Gene had the right to reenter, take possession of, and relet the premises.

Generally, courts enforce clauses in commercial leases that reserve a landlord's right to peaceably reenter commercial premises and regain possession if a tenant breaches a material obligation. See 49 Am. Jur. 2d, Landlord and Tenant §§ 832, 833. K.S.A. 58-

2506, by excepting written contracts from its provisions, does not mandate a different result for farm leases. Therefore, such a clause in a written farm lease will be enforced by the courts.

The provisions of paragraph 9 do not require any notice to the tenant or any other affirmative action by the landlord. Hence, under paragraph 9 of the written lease, Gene could terminate the contract without notice. Even assuming there was an implied requirement that notice be given in order for there to be a termination of the lease, it was satisfied because, as found by the district court, the coadministrators had actual knowledge that Spencer was farming the property.

Before discussing whether the circumstances allowed Gene to exercise his rights under paragraph 9, we will address Gene's arguments that under common-law principles the other landlords had the same rights to renter their land and negotiate new leases.

*C. Estate's Claim Under Oral Leases.*

Specifically, Gene suggests that the Estate's argument that the oral leases continued until a notice of termination was served is contrary to the general principle that if a tenant abandons, surrenders, or repudiates a lease a landlord has an obligation to mitigate damages, including reletting the premises. Kansas follows the minority position, imposing upon a landlord the duty to make reasonable effort to secure a new tenant if a tenant surrenders possession of leased property. *Gordon, Executor v. Consolidated Sun Ray, Inc.,* 195 Kan. 341, Syl. ¶ 3, 404 P.2d 949 (1965). See Annot., *Landlord's Duty on Tenant's Failure to Occupy, or Abandonment of, Premises, to Mitigate Damages by Accepting or Procuring Another Tenant,* 75 A.L.R.5th 1. On several occasions, this court has recognized that when a farm tenant abandons leased property the landlord and tenant relationship is terminated. *E.g., Christenson v. Ohrman,* 159 Kan. 565, 569, 156 P.2d 848 (1945) (surrender of farm land terminates relation of landlord and tenant but does not terminate relationship of debtor and creditor); *McAlister v. Miller,* 130 Kan. 77, 79-80, 285 Pac. 532 (1930) (recognizing surrender of leased premises as termination of tenancy).

Additionally, Gene argues the landlords could rescind the contracts. In his trial brief before the district court, Gene argued: "The common sense approach to enforcement of the farm tenancy lease indicates that if there is any abandonment, in any way, as recited herein, that the landlord has a right to rescind the lease and go upon the property in an effort to mitigate his damages." Gene then claimed there had been abandonment, stating: "The death of David Sauder amounted to abandonment. Kansas law clearly states that a tenant who abandons the lease, for whatever reason, can not recover the crop he did not plant or harvest . . . . The lease is forfeited and rescinded."

*Jinnings v. Amend*, 101 Kan. 130, 165 Pac. 845 (1917), provides support for this argument. In *Jinnings*, the court considered the effect of the tenant's incarceration upon his obligations to pay rent pursuant to a sharecrop agreement. The court concluded the lease could be terminated based upon the tenant's failure to farm the property. The court noted:

"There is nothing peculiar about a lease that takes it out of the operation of the rules of fair dealing that govern in other contractual relations. Here the essence of the arrangement was that the defendants were to furnish the land and certain implements, material, and money, and the plaintiff was to furnish his care, skill, and labor, and the proceeds were to be divided. Although the contract may be said to have created an estate in the land, it was essentially executory—its provisions were mutually dependent. The plaintiff was not in control of the land, to use it at his pleasure. He was bound to handle it in a stated way, and to perform certain acts with regard to it, and these obligations were as important as any other part of the contract." 101 Kan. at 132.

The court then rejected an argument that the lease could not be terminated before the end of its term, stating: "[I]t can not be doubted that if [the tenant] had completely abandoned the place, or had utterly refused compliance with the agreement, the owners would not have been required to permit the land to remain idle for several years." 101 Kan. at 133. Instead, the court concluded, the landowner had the right to rescind the contract based upon the tenant's anticipatory breach of contract. 101 Kan. at 133-34; see 1 Black on Rescission and Cancellation § 210 (2d ed. 1929).

The court found the implied covenant to plant the crops, from which income for both parties would be derived, to be a material provision. In fact, the court referred to the covenant as "the essence of the arrangement." *Jinnings*, 101 Kan. at 132. It follows that the failure to plant the crops defeats the object of the parties in making the agreement; see also *Hoffpauir v. Hoffpauir*, 280 So. 2d 855 (La. App. 1973) (failure to cultivate is breach justifying termination of 10-year lease). Compare *Kohn v. Babb*, 204 Kan. 245, 250-51, 461 P.2d 775 (1969) (failure to include government payment in farm accounting not material and not sufficiently substantial to defeat object of farm lease).

A similar analysis applies in this case. Here, the district court determined there had been a physical abandonment of the tenancies. There was, however, no finding that the tenant intended to abandon the properties. Therefore, as in *Jinnings,* the district court's findings are more in the nature of a surrender of the tenancies and a termination of the leases arising because the lessee failed to perform an action required under the leases. See *Rook v. James E. Russell Petroleum, Inc.*, 235 Kan. 6, 16, 679 P.2d 158 (1984) (noting three situations that are often confused, only one of which is truly abandonment: [1] a termination of a lease arising because the lease requires action by the lessee which the lessee fails to perform; [2] true abandonment arising because the lessee consciously intends to give up the lease and commits some positive act of abandonment; and [3] where there has been no act done to demonstrate an intent to abandon but the lessee intends to postpone action required by contractual covenants while keeping the lease).

In this case, as in *Jinnings*, the oral farm leases consisted of the landlords' promise to furnish the land and the tenant's promise to furnish care, skill, and labor. The contracts were executory; the contractual provisions were mutually dependent. The tenant was not in control of the land, to use it at the tenant's pleasure. The tenant was bound to plant, care for, and harvest crops from which proceeds would be obtained and divided. The failure to plant the crops would defeat the essence of the agreement, justifying the landlord's recision of the lease. See *Jinnings*, 101 Kan. at 132.

The Estate suggests that, even if the tenant surrenders possession and fails to plant the crops, the landlord's only remedy is to terminate the lease by giving notice before March 1. This argument is contrary to *Jinnings*, which did not impose a notice requirement; in fact, the *Jinnings* court did not discuss any Kansas statutes even though a version of K.S.A. 58-2506 has existed since 1868; see G.S. 1868, ch. 55, sec. 6. This omission does not make the *Jinnings* court's analysis suspect.

When a tenant fails to plant crops and surrenders occupancy, K.S.A. 58-2506 does not apply. As previously discussed, the statutory notice is required only "in cases of tenants occupying and cultivating farms," which means situations where the tenant has performed customary tillage practices, planted crops, and applied fertilizer, herbicides, or pest control. The fact that David had farmed the properties consistent with customary practices prior to his death and was occupying and cultivating the properties at the time of his death does not mean the leased premises continued to be occupied and cultivated after his death.

The legislative purpose of K.S.A. 58-2506 is apparent. Farming, unlike other commercial lease situations, requires the tenant to expend funds and labor and finance those expenses without compensation until the crop matures and is harvested. K.S.A. 58-2406 prevents a landlord from terminating the lease and reaping the harvest after the tenant has incurred the expense but has not been compensated. K.S.A. 58-2506 requires a landlord to suffer the presence of a tenant while a crop is growing but allows the landlord to remove the tenant before the next growing season. See *Bearden v. John Hancock Mut. Life Ins. Co.*, 635 F. Supp. 1084, 1086-87 (D. Kan. 1986) (discussing legislative history of K.S.A. 58-2506 and related statutes). When a lease is terminated before planting but after the tenant, acting in conformance with customary practices, has incurred expenses in cultivating the land or applying fertilizers, herbicides, or pest control, the landlord must reimburse the tenant for the fair and reasonable value of the services furnished and the materials utilized. K.S.A 58-2506a(a); see also K.S.A. 58-2506a(b) (establishing special rule that applies to alfalfa, a perennial crop where the tenant would expect several years of return; landlord

can terminate lease but must reimburse tenant for fair and reasonable value of services and expenses).

While K.S.A. 58-2506 and K.S.A. 58-2506a prescribe the method for terminating an oral farming lease while the tenant is occupying and cultivating the property and thereby provide some protection to the tenant, the provisions do not force the landlord to suffer a loss of income when the tenant does not occupy and cultivate the land. The failure to timely plant crops in keeping with customary farm practices means that the tenant is no longer occupying and cultivating the premises. In *Rogers v. Ostmeyer*, 180 Kan. 265, 266, 302 P.2d 999 (1956), when the farm tenant moved off the leased premises and surrendered possession with the consent of the landlord, the court concluded that "[s]tatutory notice to quit the premises was therefore unnecessary." See also Hannah, *The Legal Status of Tenant Farmers in Kansas*, 7 U. Kan. L. Rev. 295, 308-09 (suggesting because no Kansas statute specifically addresses the situation of a tenant's abandonment or surrender, "by the application of common law the same result would likely be reached").

Other jurisdictions with statutes requiring notices to terminate farm leases have recognized the right to rescind the contract without notice during the term of the sharecrop contract, especially when the tenant has abandoned, surrendered, repudiated, or materially breached the lease. See, *e.g.*, *Agrinetics, Inc. v. Stob*, 90 Ill. App. 3d 107, 110, 412 N.E.2d 714 (1980) (when sharecropping agreement is breached, the injured party may [1] treat the contract as rescinded and recover on quantum meruit so far as performed; [2] treat the contract as alive and, at the end of the term, sue and recover under the contract; or [3] treat the repudiation as putting an end to the contract and sue for the profits that would have been realized had performance not been prevented). See generally Annot., *Liability for Breach of Farming Lease or Contract*, 35 A.L.R.5th 285.

### D. Sufficiency of Findings.

The final question is whether the district court's findings in this case are sufficient for us to determine that the landlords had a right

to reenter their property and negotiate new leases. Generally, an appellate court reviews the district court's findings of fact to determine if the findings are supported by substantial competent evidence and whether the findings are sufficient to support the district court's conclusions of law. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion. *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. 313, 318, 64 P.3d 372 (2003).

Although discussing the issue of laches, the district court made findings that support the conclusion that the Estate breached the covenants, entitling the landlords to terminate the leases. The district court found: "The Estate of David Sauder failed to act to continue the farming leases. Nothing was done by the estate to continue farming activities after David Sauder's death." After further discussion of the evidence, the district court concluded: "[W]hen time is critical to completion of a crop-share farm lease the lapse of time is magnified. The Court believes the Estate was required to act immediately to carry out the farm lease if the estate intended to try and enforce the shares provision of the farm lease." However, the court concluded the Estate did not do so; rather, "a reasonable time passed without the estate taking action to continue the farming operation. Therefore, the landlords were justified in taking over the farm leases to protect their interest."

Substantial competent evidence supports these findings of fact. For example, Gene was asked, "Was it imperative that the corn be planted right then the next week following his death?" Gene answered, "Oh, yes." Gene also testified that he did not believe the heirs had the ability and experience to farm the property. Additionally, the Estate took no steps to farm the property even though, as the district court found, "[f]arming is a time sensitive business. The months of April, May, June, and July are the busiest time of the year except for fall harvest."

The Estate argues for a different conclusion, suggesting the corn did not have to be planted as quickly as the landlords suggest, the Estate had the right to plant crops other than corn and those crops could have been planted later than corn, and the Estate could have hired custom farmers or relied upon volunteers to farm the prop-

erty. Although there may be evidence to support these arguments, an appellate court does not reweigh the evidence or reject findings simply because there is evidence to support different findings than those made by the district court as the trier of fact. Rather, on appeal the issue is whether there is substantial competent evidence to support the findings that were made. Here, there was substantial competent evidence to support the trial court's findings.

Additionally, the findings of fact are sufficient to support the district court's conclusion that the landlords were justified in reentering the premises, terminating the leases, and reletting the properties. The Estate's failure to perform in compliance with the covenants, specifically the failure to plant crops from which rent would be paid and as contemplated by the parties, was a surrender of the premises giving rise to the landlords' duty to relet the properties.

Thus, under paragraph 9 of the written lease, the tenant failed to perform a condition of the lease and Gene could take possession of the premises and negotiate a new lease. As to the properties subject to the oral leases, the tenant, after failing to plant crops at a time consistent with customary farming practices and expectation of the parties to the lease, was no longer occupying and cultivating the property and, therefore, no statutory notice to quit was required. The landlords had a duty to mitigate damages by reletting the premises.

Even though the district court did not rely upon paragraph 9 or the holding of *Jinnings* and the common law regarding termination of nonresidential leases, it rendered a correct judgment under the facts and the law; therefore, the judgment will not be disturbed merely because we rely upon a different rationale. See *National Equipment Rental, Ltd. v. Taylor*, 225 Kan. 58, 62, 587 P.2d 870 (1978); *Boldridge v. Estate of Keimig*, 222 Kan. 280, 288, 564 P.2d 497, *cert. denied* 434 U.S. 967 (1977).

The Estate asserts an additional argument, suggesting that even if it is not entitled to the entire share of the tenant's portion, it is entitled to compensation for the expenses and time of preparing and fertilizing the land that was the subject of the oral leases. Three theories could lead to this result. First, K.S.A. 58-2506a requires reimbursement for expenses when a notice of termination is given

after the expenses are incurred but before a crop is planted. We have concluded, however, that the notice of termination provisions do not apply in this case because the tenant was no longer occupying the premises. Second, the matter could be determined by contract. See *Kohn,* 204 Kan. at 251-52 (where written lease was silent as to restitution for services and expenses if lease terminated, tenant who unjustifiably abandoned lease did not state claim for relief because parties could have contemplated issue and were silent in granting right to claim, implying no intent to allow reimbursement). Here there is no evidence regarding an agreement whether such a claim could be made. The terms of the oral contracts apparently did not cover contingencies (or, at least, no evidence regarding such agreements was entered into the record on appeal) making it impossible to determine the parties' intent. Third, equity could apply. Although the decision in *Kohn* discusses several cases where equity resulted in a conclusion that a tenant who had voluntarily surrendered possession or breached a contract was not entitled to recover expenses and labor, these cases, as is true of all cases applying equity, are fact based.

The Estate suggests that to deny reimbursement for the expenses of fertilizer and David's labor leads to the unjust enrichment of Spencer and the landlords. The theory of unjust enrichment rests upon three elements: (1) a benefit conferred; (2) an appreciation or knowledge of the benefit by the one receiving the benefit; and (3) the acceptance or retention of the benefit under such circumstances as to make it inequitable to retain the benefit without payment of its value. *Haz-Mat Response, Inc. v. Certified Waste Services Ltd.,* 259 Kan. 166, 177, 910 P.2d 839 (1996); *J.W. Thompson Co. v. Welles Products Corp.,* 243 Kan. 503, 512, 758 P.2d 738 (1988). Each element is satisfied in this case.

The Estate suggests that the only way to avoid unjust enrichment is to allow it to recover the tenant's entire share of the crops. Contrary to this argument, such a recovery would allow the Estate to be unjustly enriched for the labor and expenses incurred by Spencer. However, the Estate's argument seems to encompass a request for restitution of the actual fertilizer expenditures by David and for his time in preparing the ground for planting. Recovery for these

expenses and labor is more equitable; it prevents the unjust enrichment of any party.

We, therefore, remand with directions to the district court to determine the appropriate restitution to the Estate for the expense of the fertilizer and the value of the labor expended by David in the fall of 2003.

Judgment of the Court of Appeals affirming in part, reversing in part, and remanding with directions is affirmed in part and reversed in part. Judgment of the district court is affirmed in part, reversed in part, and remanded with directions.