No. 101,063

RODNEY G. SCHOENHOLZ, *Appellant/Cross-appellee*, v.
JANINE HINZMAN, *Appellee/Cross-appellant*.
(289 P.3d 1155)

Opinion filed October 12, 2012.

*Don W. Noah*, of Noah Law Office, P.A., of Beloit, argued the cause, and *Mark J. Noah*, of the same firm, was with him on the briefs for appellant/cross-appellee.

*William R. Thompson*, of Condray & Thompson, LLC, of Concordia, argued the cause and was on the briefs for appellee/cross-appellant.

The opinion of the court was delivered by

ROSEN, J.: This is an unfortunate story of a business and familial relationship gone bad. Rodney Schoenholz entered into an oral agreement with his sister, Janine Hinzman, for the bailment of farm animals and farm equipment on her land. Four years after their cooperative effort to breed horses broke down, Hinzman sold her farm and the horses. Schoenholz subsequently retrieved most of his equipment from the farm and sued Hinzman for conversion and breach of the bailment contract. Hinzman counterclaimed for the expenses of maintaining the equipment and caring for the horses.

The district court awarded no damages. The Court of Appeals affirmed the rulings against Schoenholz but found the district court had erred in denying Hinzman compensation for caring for some of the horses and had abused its discretion in denying sanctions against Schoenholz. We disagree with the principal parts of the Court of Appeals' decision and remand the case to the district court for further proceedings.

The dates and substance of the parties' actions are significant to our analysis. In 1999, Schoenholz and Hinzman orally agreed to operate a joint horse-breeding enterprise. Schoenholz was to provide breeding horses, and Hinzman was to take care of the horses on her farm and would promote breeding with her own horses.

Schoenholz would store equipment, including a tractor, and materials on her farm to aid in the enterprise, and the two would evenly split the proceeds from the sale of the horses.

In August 2002, after an argument about payments, Schoenholz and Hinzman ended the joint enterprise, and Schoenholz agreed to remove his animals from the farm by April 2003. As of April 2003, he had removed neither his horses nor his equipment. He did not remove any of his equipment other than his tractor until 2007. He explained that he refused to retrieve his property because he had no place to store it.

Hinzman stopped using the tractor in 2003, and it sat idle on her farm for more than 3 years until Schoenholz retrieved it at the end of 2006. Hinzman provided all the care for the horses, including not only the original horses that Schoenholz had provided but also the unsold offspring of those horses, from April 2003 until she sold them.

One of Schoenholz' horses, World Ruler, developed health problems and had to be quarantined. Hinzman initially boarded World Ruler at her daughter's farm, and then moved the horse to her own farm for a period of 1,260 days after April 2003.

The parties had multiple conversations during which Hinzman complained about Schoenholz storing his equipment on her farm. During the course of one of these discussions, when Hinzman asked him to remove the horses and equipment, Schoenholz struck Hinzman, and he was charged with battery.

On September 22, 2006, Schoenholz entered into a diversion agreement for the battery, one condition of which was that he would "remove all of his personal property, of whatever kind, from the victim's residence . . . within sixty (60) days of the signing of the diversion." A provision was made that he would "be accompanied by law enforcement if deemed appropriate by the victim." On August 6, 2007, the State filed a motion to dismiss the charges with prejudice based on Schoenholz' alleged satisfaction of the terms of the diversion agreement. The district court granted the motion, even though Schoenholz had not removed his property from his sister's farm.

Finally, in 2006, Hinzman sold her farm and the horses. In 2007, after Hinzman had turned the farm over to a new owner, Schoenholz removed his property from the farm.

On May 3, 2007, Schoenholz filed a petition in district court seeking damages for horses that were not returned, depreciation of the tractor, and loss of fencing materials, a bale fork and link, and other farm-related materials. Hinzman filed an answer and counterclaim for the costs associated with storing Schoenholz' equipment and caring for his horses. Following unsuccessful motions for summary judgment and sanctions, a trial was held on January 24-25, 2008. The district court essentially ruled against both parties on all claims and counterclaims, as well as on requests for sanctions.

The Court of Appeals, in an unpublished opinion, affirmed the district court in denying Schoenholz' claims but reversed the district court's finding that Hinzman was not entitled to damages for the care of the horses and in finding that Hinzman was not entitled to costs for violations of a discovery order. *Schoenholz v. Hinzman*, No. 101,063, 2010 WL 445693 (Kan. App. 2010) (unpublished opinion).

Schoenholz filed a petition for review, which this court granted. Hinzman did not file a petition for review of the issues on her cross-appeal.

*Preliminary Discussion of the Law of Farm Bailments and Gratuitous Bailments*

Although the parties did not base their claims on or address the statutory scheme, the Kansas Legislature has enacted several statutes that govern bailments of livestock and unpaid costs for feeding and caring for that livestock. K.S.A. 58-207 *et seq.* has been in effect, with only minor modifications, since 1868.

As a general principle, a statutory remedy will supersede a common-law remedy so long as the statute provides an adequate substitute remedy. See, *e.g., Bair v. Peck*, 248 Kan. 824, 838-39, 811 P.2d 1176 (1991). For this reason, we must examine the parties' claims and counterclaims in light of the statutory requirements,

notwithstanding the parties' arguments that are grounded in the common law.

K.S.A. 58-207 establishes a lien on boarded livestock and allows a bailee of horses to sell the horses if the bailor fails to pay for their feed and care for 60 days after a demand is made:

"The keepers of livery stables, *and all others engaged in feeding horses*, cattle, hogs, or other livestock, *shall have a lien upon such property for the feed and care* bestowed by them upon the same, *and if reasonable or stipulated charges for such feed and care be not paid within sixty (60) days after the same becomes due, the property, or so much thereof as may be necessary to pay such charges and the expenses of publication and sale, may be sold as provided in this act: Provided, however*, That any lien created by this act may be assigned." (Emphasis added.)

K.S.A. 58-208 allows a bailee to sell goods left in the possession of the bailee for more than 6 months, if there is a lien on the goods and if the bailee properly advertises the sale:

"*Any* forwarding merchant, warehouse keeper, stage, express or railway company, hotelkeeper, carrier, or other *bailee* not hereinbefore named, *having a lien upon goods which may have remained in store or in the possession of such bailee for six months or more, may proceed to sell such goods*, or so much thereof as may be necessary to pay the amount of the lien and expenses, according to the provisions of this act: *Provided, That such sale may be advertised* and made by any carrier in any city of the first, second or third class through which its line runs, where, in the judgment of such carrier, the best price can be obtained for the property to be sold." (Emphasis added.)

K.S.A. 58-209 allows a bailee of livestock and perishable property to dispose of the property in order to pay for the expenses of maintaining the livestock or other perishable property 30 days after charges for the upkeep become due:

"*If the property bailed or kept be horses*, cattle, hogs, or other livestock, or is of a perishable nature and will be greatly injured by delay, or be insufficient to pay such charges for any further keeping, *the person to whom such charges may be due may, after the expiration of thirty days from the time when such charges shall have become due, proceed to dispose of so much of such property as may be necessary to pay such charges and expenses* as herein provided." (Emphasis added.)

K.S.A. 58-211 requires the bailee to provide *written notice* to the bailor before disposing of property if the name and residence of the owner is known:

*"Before any such property shall be sold, if the name and residence of the owner thereof is known, notice of such sale shall be given the owner in writing,* either personally or by mail, or by leaving a notice in writing at such person's residence or place of doing business. If the name and residence is not known, the person having the possession of such property shall cause a notice of the time and place of sale, and containing a description of the property, to be published at least once a week for three consecutive weeks in a newspaper, if there is one published in the county where such sale is advertised to take place, and if there is no newspaper published in such county, then the notice shall be published in some newspaper of general circulation in such county. If the value of the property does not exceed $100, such notice may be given by written or printed handbills posted in at least five public places in the township or city where the bailee resides or the sale is to take place, one of which shall be in a conspicuous part of the bailee's place of business. *Notices given under this section shall state that if the amount due with storage keeping and sale costs is not paid within 15 days from the date of mailing, personally giving or posting of the notice (as the case may be), the property will be sold at public auction."* (Emphasis added.)

Hinzman fell within the provisions of these statutes. She had the option of selling Schoenholz' horses, or shares of horses, but only after she had made a demand for the reasonable costs of upkeep and only after providing printed notice of the sale. She did not follow the statutory mandates for disposing of the horses, and, as a consequence, she incurred certain ongoing responsibilities for taking care of them.

*The Statute of Limitations*

The interpretation and application of a statute of limitations is a question of law over which an appellate court exercises unlimited review. An appellate court's review of a lower court's conclusions of law is likewise unlimited. *Smith v. Graham,* 282 Kan. 651, 655, 147 P.3d 859 (2006).

Because she did not follow the statutory procedures for selling the horses, Hinzman remained a bailee even after Schoenholz stopped making contributions to the upkeep of the bailment property. A gratuitous bailment has been defined as one "in which either the bailor or the bailee is the sole beneficiary of the bailment." *Waggoner v. General Motors Corp.,* 771 P.2d 1195, 1198 (Wyo. 1989). Schoenholz was the only party benefitting from the bailment

arrangement after April 2003, and Hinzman was therefore a gratuitous bailee from that time on.

The gratuitous bailment was open-ended. It would last until Schoenholz claimed his property or until Hinzman elected to take the recourse afforded by K.S.A. 58-207 *et seq*. In the case of a bailment for an indefinite period, the cause of action does not accrue until the bailor makes a demand for the property. *Jay-Ox, Inc. v. Square Deal Junk Co., Inc.*, 208 Kan. 856, 858, 494 P.2d 1103 (1972). The statute of limitations did not begin to run until Schoenholz approached Hinzman and told her he wanted his property back. Until that time, she was a gratuitous bailee of all of Schoenholz' property.

The statute of limitations for oral contracts is 3 years. K.S.A. 60-512. The statute of limitations for torts involving taking, detaining, or injuring personal property is 2 years. K.S.A. 60-513(2).

The district court found that the statute of limitations for both Schoenholz' contract and tort claims began to run in April 2003, the date Hinzman gave him to remove his horses and equipment from her farm. On that date, according to the district court, the bailment contract expired. This conclusion was erroneous. A bailment relationship remained in effect because Hinzman still voluntarily retained possession of Schoenholz' property. The statute of limitations did not begin to run until Hinzman sold the property in 2006. Schoenholz filed suit on May 3, 2007, well within the limitation periods for both contract and tort claims.

The Court of Appeals affirmed the district court's ruling with respect to the statute of limitations. The Court of Appeals stated that it was reviewing the district court's finding of "abandonment" under a substantial competent evidence standard. It held that Schoenholz "abandoned" his property for over 3 years without just cause, exceeding the limits of the statutes of limitations.

As the Court of Appeals correctly noted, abandonment is a question of fact. See *Rodgers v. Crum*, 168 Kan. 668, 673, 215 P.2d 190 (1950). The Court of Appeals also correctly noted that an appellate court reviews findings of fact to determine whether those findings are supported by substantial competent evidence. See, *e.g.*, *In re Adoption of J.M.D.*, 293 Kan. 153, 171, 260 P.3d 1196

(2011). It erred, however, when it inexplicably relied on a factual finding that the district court rejected. The district court explicitly determined that Schoenholz did not abandon his property. He merely relinquished possession, and he remained the owner of the horses when Hinzman sold them.

Abandonment is the voluntary relinquishment of ownership, so that something ceases to be the property of any person and becomes the subject of appropriation by the first taker. *Rodgers*, 168 Kan. at 672-73. Abandonment requires an intent by the owner to give up the rights of ownership in the property. See *In re Estate of Sauder*, 283 Kan. 694, 714, 156 P.3d 1204 (2007); *Herron v. Whiteside*, 782 S.W.2d 414, 416 (Mo. App. 1989) (abandonment of property requires intent plus an act); *Conway et al. v. Fabian et al.*, 108 Mont. 287, 306, 89 P.2d 1022 (1939) (in determining abandonment intention is first and paramount factual inquiry).

The record on appeal supports the district court's finding that Schoenholz did not abandon his property, and the record does not support the inappropriate reweighing of the evidence by the Court of Appeals. Schoenholz testified that he intended to retrieve his property whenever he could find a place to store his equipment and board his horses. That he made minimal—or no—effort to carry out the retrieval does not undermine his intention to preserve his ownership rights in the property.

This is significant, because the finding that he did not abandon his property preserves Schoenholz' conversion claims. He still owned the horses in 2006 when Hinzman sold them, and the cause of action arose at that time, meaning that Schoenholz' action in tort was not barred by the statute of limitations.

*The Conversion Claim*

It is apparent from the record that Hinzman acted in good faith, shouldered a substantial responsibility for caring for Schoenholz' property, and attempted to return his property to him before she sold the horses. It is the rule in this state, however, that when a bailee converts property under his or her care, the bailee is answerable for the conversion, " 'no matter how good his intentions or how careful he has been.' " *Lipman v. Petersen*, 223 Kan. 483,

485, 575 P.2d 19 (1978) (quoting 8 Am. Jur. 2d, Bailments § 109, pp. 1007-08); see also *Loomis v. Imperial Motors, Inc.*, 88 Idaho 74, 396 P.2d 467 (1964) (where bailee tenders return of property and return of property is refused, bailee becomes gratuitous bailee, meaning bailment is for sole benefit of bailor; and bailee may be liable for gross negligence).

That Schoenholz may have acted in a manner that frustrated Hinzman's efforts to rid herself of the horses is not relevant here. It is likewise irrelevant that Hinzman may have acted in good faith and in the belief that she was operating within her legal rights. Statutory provisions do not distinguish between debtors with clean hands and those without. *Redmond v. Kester*, 284 Kan. 209, 218, 159 P.3d 1004 (2007). If the bailee acted intentionally, " 'it is immaterial that the bailee may have mistakenly believed that he was acting within his legal rights.' " *Lipman*, 223 Kan. at 485 (quoting 8 Am. Jur. 2d, Bailments § 109, pp. 1007-08).

When a bailee makes an unauthorized disposition of the bailor's property, the bailor may have a cause of action for conversion:

"An absolute and unqualified refusal by the bailee to return or redeliver the property to the bailor, made in derogation of the bailor's title or right to possession, constitutes actionable conversion. Furthermore, the bailee cannot qualify his or her duty to return the bailed property by prescribing conditions not implied by law or contemplated by the parties in the contract of bailment without being guilty of conversion. A bailee is not guilty of conversion, however, where his or her refusal to redeliver the property to the bailor is qualified by the conditions that are reasonable and not inconsistent with the bailor's rights, provided that the reason for the refusal to return the item is immediately communicated to the bailor. For example, a refusal to return bailed property is justified when it is accompanied by a demand for payment of charges for which the bailee has a lien." 8A Am. Jur. 2d Bailments, § 75, pp. 598-99.

Because Hinzman did not utilize the statutory mechanism to sell the horses, she had no legal right to refuse delivery of the horses to Schoenholz when he demanded them. He therefore had a claim for conversion, and the district court and the Court of Appeals erred by rejecting that claim.

*Damages for Unjust Enrichment*

Hinzman counterclaimed for the costs associated with caring for the horses after April 2003. The district court denied the counterclaim, noting that Hinzman never requested payment from her brother, failed to mitigate damages, and was barred by the statute of limitations from seeking recovery for her expenses. Hinzman challenged these conclusions in her cross-appeal. The Court of Appeals reversed, holding that Hinzman had proven the elements of unjust enrichment and she was entitled to damages for the 3 years preceding the filing of her counterclaim. Unjust enrichment is not, however, a theory appropriate to this case, which is governed by a statutory remedial scheme.

In bailments at common law, a gratuitous bailee has no right to recover from the owner the costs of caring for the property. *Hartford Ins. Co. v. Overland Body Tow, Inc.*, 11 Kan. App. 2d 373, 376-77, 724 P.2d 687 (1986) (quoting 8 Am. Jur. 2d, Bailments § 25, p. 757). K.S.A. 58-207, however, establishes a statutory lien on boarded livestock:

"The keepers of livery stables, and all others engaged in feeding horses, cattle, hogs, or other livestock, *shall have a lien* upon such property for the feed and care bestowed by them upon the same." (Emphasis added.)

The statute does not appear to require the keeper to take any action other than feeding and caring for the livestock in order to create the lien. *Cf.* K.S.A. 58-201 (requiring registration of mechanic's lien within 90 days of parting with possession of the subject property).

Hinzman may have therefore possessed a lien on the horses for the expenses associated with maintaining them. The purpose of an action in tort is to restore the plaintiff to the position that he or she would have occupied had the injury not occurred. *Arche v. United States of America*, 247 Kan. 276, 281-82, 798 P.2d 477 (1990). In the present case, the purpose of Schoenholz' conversion action is to compensate him for the value of the horses he would have received back from Hinzman when he demanded them. If Hinzman had a lien on those horses for the costs of feeding and caring for them, that amount could potentially be applied to offset

any damages that Schoenholz can prove based on the conversion of his horses.

Neither party in this action has cited to Kansas law relating to this subject matter. On remand, it remains for the parties to argue and the district court to determine the existence and value of any claimed lien on the horses and whether the fact that other duties proscribed under the statute were not followed impacts the efficacy of any such lien.

*Damages for the Tractor*

Schoenholz sought damages for the alleged deterioration of the tractor that he left sitting out in the open on Hinzman's farm. The district court found that the parties created an implied bailment of the tractor in 1999 when Hinzman accepted the use of the tractor on her farm and allowed Schoenholz to leave the tractor on her premises. The court then noted a legal presumption that the bailee is at fault if bailment property is damaged while in the exclusive possession and control of the bailee. The court found that the tractor suffered damage between 1999 and 2006 and that the tractor was not used after the spring of 2003 by either party. The district court concluded, however, that there was no evidence of when the damage occurred to the tractor and the statute of limitations barred any recovery for the deterioration. The Court of Appeals agreed that the statute of limitations had run for any negligence claim with respect to the tractor.

As with the horses, Hinzman allowed Schoenholz to keep his tractor on her farm. Although the tractor was not the subject of a lien statute as the horses were, she did not forfeit her status as a bailee simply because Schoenholz did not retrieve or maintain his tractor. Her bailee status did not, however, oblige her to take positive steps to keep the tractor in the same condition in which Schoenholz left it.

A gratuitous bailee is not liable for any injury arising from "nonfeasance," that is, from inaction. *Maddock v. Riggs,* 106 Kan. 808, 190 P. 12 (1920). Hinzman was not under a special duty to service the tractor and move it to some sheltered place different from where her brother had left it. She was therefore not liable for any

loss in value that the tractor may have suffered. While the district court erred in finding that the statute of limitations barred recovery, we affirm the conclusion that Schoenholz was not entitled to damages to the tractor as having been right for the wrong reason. See *State v. Graham*, 277 Kan. 121, 133, 83 P.3d 143 (2004) (reason given by district court for its ruling is immaterial if the result is correct).

*The Order to Reclaim the Bale Fork and Link*

Schoenholz contends that the law does not permit the remedy ordered by the district court. This is a question of law over which this court exercises unlimited review. See *Board of Sedgwick County Comm'rs v. City of Park City*, 293 Kan. 107, 113, 260 P.3d 387 (2011).

The district court held that the bale fork and link taken by Hinzman from the farm in the apparent mistaken belief that it belonged to her was still Schoenholz' property. The court ordered Schoenholz to take possession of the bale fork and link within 30 days of the date of the order.

Schoenholz argues that the district court erred in setting a 30-day limit on his right to recover possession of the bale fork and link. He contends there is no statutory authority for relief conditioned on a 30-day execution of the relief. He does not argue that it is impractical to obtain the bale fork and link within the 30-day period.

The Court of Appeals held that the 30-day execution order lay within the inherent equitable powers of the district court to prevent abuse of judicial process. This was a correct determination. See, *e.g.*, *Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 926, 128 P.3d 364 (2006) (courts have inherent powers to impose sanctions for bad-faith conduct, irrespective of statutory provisions). The limitation on the time to retrieve the bale fork and link is not unreasonable and recognizes Schoenholz' recalcitrance in retrieving his property and in obeying court orders.

*Schoenholz' Motion for Sanctions*

Schoenholz moved for sanctions in the district court based on certain mistakes made by counsel for Hinzman, including service

of subpoenas in Nebraska and statements made in pleadings with which the district court later disagreed. The district court denied the relief, and the Court of Appeals affirmed, noting that Schoenholz had failed to designate any portion of the record in support of his argument, citing Supreme Court Rule 6.02(d) (2011 Kan. Ct. R. Annot. 39).

The award of sanctions, including attorney fees, for discovery violations is reviewed using an abuse of discretion standard. *Canaan v. Bartee*, 276 Kan. 116, 135, 72 P.3d 911, *cert. denied* 540 U.S. 1090 (2003). Assuming Schoenholz' assertions of impropriety on the part of opposing counsel to be true, we do not discern any willful behavior on the part of that counsel sufficient to require the district court to award sanctions.

*Hinzman's Request for Attorney Fees*

During discovery, Hinzman twice requested copies of Schoenholz' state and federal tax returns for the years 2000 through 2006. Both times, Schoenholz refused to provide the returns, arguing that they contained confidential information and were irrelevant to the action. The district court then granted Hinzman's motion to compel production, but Schoenholz nevertheless refused to produce them. It was finally revealed on the day of the trial that he did not file any tax returns for the years that Hinzman had requested them. She then asked the court to award her $2,000 as a sanction. The district court denied the request, holding that the returns were not material to the substantive issues, although Schoenholz' lack of candor went to the credibility of his testimony. The Court of Appeals found the denial of the motion to constitute an abuse of discretion and remanded for imposition of attorney fees.

We will consider the discovery issue in detail because the record discloses acts of dishonesty on the part of Schoenholz and a lack of candor with both the district court and the appellate courts on the part of Schoenholz' attorney.

On September 7, 2007, Hinzman served on Schoenholz a request for production of documents, including state and federal tax returns for the years 2000-2006. Schoenholz objected to the re-

quest because the returns "contain confidential information and for the further reason that no accounting is requested from the Plaintiff and nothing on his tax returns could be material to evidence in this lawsuit."

On November 15, 2007, Hinzman served a second request for production, repeating the request for tax records. Responding to the second request, Schoenholz, through counsel, objected to furnishing any information from his tax returns because "they contain confidential information and would not provide any proof or lead to any admissible evidence in this case. Further, Plaintiff does not have possession of this information and has been unable to reacquire possession of any of his returns since the filing of this lawsuit."

Hinzman then filed a motion to compel production of the documents. The motion listed a number of reasons why the tax records were relevant. These included: showing the initial costs of some of the horses, whether Schoenholz had sold any of the horses, the depreciation on the tractor, the expenses for supplies such as fencing, feed, etc., and whether Schoenholz in fact lacked the space and resources to relocate the horses and equipment when he may have purchased more horses and may have paid rent for a lot to store other personal property belonging to him.

The district court granted the motion to compel production in part. The court stated:

"Mr. Schoenholz, they have made an early request for discovery of your income tax returns and have showed that those documents are relevant. You will be required to take the steps necessary to get those documents produced to the Defendant in this case. . . . [T]he Court finds that those [tax] documents are relevant . . . . Mr. Schoenholz is ordered compelled to produce. Mr. Condray, if you can come up with another suggestion on how to find those documents, I will entertain the same, but we're not going to delay the trial date at this point in time."

The pretrial order reiterated that the plaintiff "shall produce tax returns for the years 1999 through 2006 inclusive." Hinzman's counsel then sent Schoenholz' counsel information about how attorneys could gain electronic access to tax records with the consent of their clients.

Schoenholz' counsel informed the court immediately before the trial began:

"Well, we, I thought, made a showing at the hearing on that that we simply don't have them, and it was my understanding that the Court's last comment was the IRS just doesn't move that speedy, and we're here, and we—we feel that we made a showing if they're not in our possession, there's not much else we can do, and the Court did not order us to give releases."

He went on to tell the court:

"The same person Mr. Schoenholz left his taxes with is the one that's prepared his returns for all this time. He doesn't have anything because of the request that was made by IRS to check this. He took them all there.

"I haven't gone up there. I understand he has. I did try to find this fellow in the telephone book. The number that I started with, that is not a working number.

. . . .

"We feel that at this late date there's really nothing that we can do, it's going to get tax returns for this trial [*sic*]."

The district court then examined counsel on why he did not seek the returns directly from the IRS through a waiver of confidentiality by his client:

"THE COURT: Mr. Noah, why did you or your client not attempt to obtain the returns from the IRS?

"MR. NOAH: No, I didn't. I — (interrupted)

"THE COURT: Why?

"MR. NOAH: Why? We weren't ordered to, Your Honor. I didn't understand we were supposed to get them. I understood when I left this hearing that it was too late, and we were not ordered to give releases or do anything else. Now, if I'm in error, if I was wrong with that, then it's my fault. I understood that it was simply too late and that was a dead letter when I left here.

. . . .

"THE COURT: I don't know how my ruling could have been any more plain that Mr. Schoenholz is ordered to, compelled to produce."

Schoenholz subsequently testified under oath regarding the returns. He informed the district court that a Mr. Underfeldt in Crete, Nebraska, prepared his returns, and Schoenholz did not have any of his tax information or returns in his own possession. He proceeded to testify that he filed returns for the years 1999-2006.

Schoenholz testified about various measures he had taken to obtain his tax materials: he had gone directly to Underfeldt's office, which was closed; he had contacted "various people" who might know where Underfeldt was; and he had left his contact information with some people who told him they would let him know if they found out where Underfeldt was.

Schoenholz testified that he went to Underfeldt's office every year to provide the information for his taxes, and sometimes he went back to pick up his records "when they would get done preparing the returns." Schoenholz' attorney then told the court that he himself had made a series of telephone calls trying to find Underfeldt, concluding, "Maybe he died."

During a recess in the trial testimony and at the court's direction, Schoenholz' attorney called a number provided by Hinzman's attorney and requested that the IRS fax the missing tax returns to the courthouse. The IRS immediately sent an account transcript showing that Schoenholz had failed to file any returns for the years 2000-2006. In response to questions about this transcript, Schoenholz initially testified that he had filed returns and written checks to the IRS.

The following colloquy between Hinzman's counsel and Schoenholz then took place:

"Q. So, Mr. Schoenholz, we've been going at this about three or four months now trying to get your tax returns.
"A. Uh-huh.
"Q. And it's all been kind of a waste of time, hasn't it?
"A. Basically, yes, but still don't do anything for the case one way or the other. I mean, hers didn't her, hinder her."

The district court, while conceding that Schoenholz had misled the court by claiming he had filed tax returns, declined to impose sanctions.

Hinzman raised the issue of fees as discovery sanctions on cross-appeal. The Court of Appeals cited K.S.A. 2008 Supp. 60-237(b)(2)(E), in effect at the time of the trial, which set out various sanctions for failure to comply with discovery orders. The section concluded:

"[T]he judge *shall* require the party failing to obey the order or the attorney advising such party or both to pay the reasonable expenses, including attorney fees, caused by the failure, unless the judge finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." (Emphasis added.)

The Court of Appeals found that Schoenholz had clearly violated the district court order and had then made misrepresentations to the court under oath. It was therefore an abuse of discretion to deny Hinzman's request for attorney fees.

In his appellate briefs, counsel for Schoenholz avoids discussing the fact that his client had lied about filing the tax returns and that he himself had represented to the district court that he had tried to retrieve the returns but did not think he was under any obligation to obtain copies directly from the IRS. His client and he stalled on the subject for some 4 months, although it was possible to obtain the necessary information electronically within a couple of hours on the morning of the trial. On review, Schoenholz' counsel again fails to mention that his client lied about the returns and that he did not attempt to get the returns from the IRS.

K.S.A. 2008 Supp. 60-237(b)(2) required a district court to order a party to pay expenses, including attorney fees, when that party failed to obey a discovery order. The only exceptions to this requirement were when the failure was substantially justified or when other circumstances made the sanction unjust.

Schoenholz lied repeatedly under oath about the existence of his tax returns. His attorney violated the district court's express orders and then neglected to inform the Court of Appeals or this court that his client's dishonesty was even at issue. Under these circumstances, we agree with the Court of Appeals that the district court abused its discretion by refusing to award attorney fees. The district court was required by statute to impose the sanction of fees. Nothing in the record suggests that the disobedience of the court order by Schoenholz or his attorney were justified, and the imposition of the sanction is just.

The Court of Appeals went on to award Hinzman attorney fees in the amount of $2,000. Hinzman does not provide a citation to the record of an affidavit of attorney fees. If the affidavit is in the

record, this court is unable to locate it. The question of attorney fees is therefore remanded to the district court for determining the amount of fees to be awarded.

The judgment of the Court of Appeals is affirmed in part and reversed in part. The judgment of the district court is affirmed in part, reversed in part, and remanded with directions.