No. 117,404

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

GARETSON BROTHERS
and
FORELAND REAL ESTATE, LLC,
*Appellees*,

v.

AMERICAN WARRIOR, INC.,
Successor in Interest to Kelly and Diana Unruh,
*Appellant*,

and

RICK KOEHN,
*Defendant*.

SYLLABUS BY THE COURT

1.

Generally, a statute operates prospectively unless (1) its language clearly indicates the Legislature's intent that it operate retroactively or (2) the change is procedural or remedial in nature. However, even procedural rules cannot be applied retroactively if they eradicate a vested or substantive right that is so fixed that it is not dependent on any future act, contingency, or decision to make it more secure.

2.

Under the doctrine of continuing jurisdiction, once subject matter jurisdiction is acquired over a case, jurisdiction over that case continues and is not divested until all issues are resolved.

1

3.

The 2017 amendments to K.S.A. 82a-716 and K.S.A. 82a-717a, although procedural in nature, do not apply retroactively to the owner of a vested water right who sought and obtained injunctive relief in the district court prior to the effective date of the amendments.

4.

The right to appeal is entirely statutory and is not contained in the United States or Kansas Constitutions. Subject to certain exceptions, Kansas appellate courts have jurisdiction to entertain an appeal only if the appeal is taken in the manner prescribed by law.

5.

K.S.A. 2017 Supp. 60-2103(b) requires: "The notice of appeal shall specify the parties taking the appeal; shall designate the judgment or part thereof appealed from, and shall name the appellate court to which the appeal is taken." Therefore, an appellate court only obtains jurisdiction over the rulings identified in the notice of appeal. Notices of appeal in civil cases are more strictly construed than in criminal cases.

6.

Under the facts of this case, where the appellant has appealed only from a specific order yet challenges on appeal rulings not part of that order without any "catch all" language in the notice of appeal, an appellate court is without jurisdiction to consider such issues.

7.

The law of the case doctrine prevents a party from serially litigating an issue on appeal already presented and decided in the same proceeding. The doctrine promotes judicial efficiency while allowing litigants a full and fair opportunity to present their

2

arguments on a particular point. Once an issue is decided by the court, it should not be relitigated or reconsidered unless it is clearly erroneous or would cause manifest injustice.

8.

The clean hands doctrine is based upon the maxim of equity that a party who comes into equity must come with clean hands. In other words, no party can obtain affirmative relief in equity with respect to a transaction in which that party has been guilty of inequitable conduct. Like other doctrines of equity, the clean hands maxim is not a binding rule but is to be applied in the sound discretion of the court.

9.

The application of the clean hands doctrine is subject to certain limitations. Conduct which will render a party's hands unclean so as to deny that party access to a court of equity must be willful conduct that is fraudulent, illegal, or unconscionable. Furthermore, the objectionable misconduct must bear an immediate relation to the subject matter of the suit and in some measure affect the equitable relations subsisting between the parties to the litigation and arising out of the transaction. Stated another way, the misconduct that may justify a denial of equitable relief must be related misconduct rather than collateral misconduct arising outside the specific transaction which is the subject matter of the litigation before the court.

Appeal from Haskell District Court; LINDA P. GILMORE, judge. Opinion filed January 11, 2019. Affirmed in part and dismissed in part.

*Gerald O. Schultz* and *Zachary D. Schultz*, of Schultz Law Office, P.A., of Garden City, for appellant.

*J. Michael Kennalley*, *Lynn D. Preheim*, and *Frank Basgall*, of Stinson Leonard Street LLP, of Wichita, for appellees.

Before POWELL, P.J., ATCHESON and GARDNER, JJ.

POWELL, J.: Garetson Brothers and Foreland Real Estate, LLC (Garetson) own a number of water rights in Haskell County, Kansas, including water right HS-003. Garetson sought injunctive relief in the Haskell County District Court to prevent the nearest junior water right holders, American Warrior, Inc. and Rick Koehn (American Warrior), from impairing its water right. In accordance with the agreement of the parties, the district court appointed the Kansas Department of Agriculture's Division of Water Resources (DWR) as referee, and subsequently, the DWR issued a report finding that American Warrior's junior water rights were substantially impairing Garetson's water right. As a result, the district court entered a temporary injunction ceasing operation of American Warrior's junior water rights 10,467 and 25,275. American Warrior brought an interlocutory appeal, and another panel of this court affirmed the temporary injunction. The district court then conducted a three-day trial and found that American Warrior's junior water rights 10,467 and 25,275 were impairing Garetson's senior water right, HS-003. The district court issued a permanent injunction prohibiting American Warrior from exercising its junior water rights. American Warrior now appeals. After a careful review of the record and for reasons more fully stated below, we affirm in part and dismiss in part.

FACTUAL AND PROCEDURAL BACKGROUND

The matter now before us has been at issue for nearly 14 years. At the heart of this dispute is Garetson's claim that American Warrior is infringing on its senior water right. Over the course of the past 14 years, this case has involved a complaint with the DWR, two temporary injunctions—one of which was vacated by the district court and the other of which was affirmed by another panel of this court in *Garetson Brothers v. American Warrior, Inc.*, 51 Kan. App. 2d 370, 347 P.3d 687 (2015), *rev. denied* 303 Kan. 1077 (2016)—and, ultimately, a permanent injunction. To provide context for the subsequent

4

facts, in February 2017 the district court granted Garetson's request for a permanent injunction against American Warrior. This permanent injunction prohibits American Warrior from utilizing its junior water rights because such use impairs Garetson's senior water right.

*History and Garetson's Complaint with the DWR*

The first neighboring well at issue in this action was approved in 1964 and was assigned appropriation water right numbered 10,467. The second neighboring well was approved in 1976 and was given appropriation water right numbered 25,275. Both of the neighboring wells at issue are used to irrigate crops. All of the wells are located in Groundwater Management District 3 in southwest Kansas, overlying the Ogallala Aquifer.

On March 14, 2005, Garetson, a Kansas general partnership, filed a complaint with the DWR, alleging two neighboring junior water rights were impairing its senior vested water right. At the time, Garetson owned a tract of land in Haskell County upon which a single well was used for crop irrigation. A prior owner of Garetson's land had filed for and received a vested water right in the well on September 12, 1950. This vested right is numbered HS-003. HS-003 is permitted to pump 240 acre-feet at a rate of 600 gallons per minute. The DWR began investigation of the complaint upon its filing.

Garetson subsequently withdrew its complaint in 2007; however, the DWR continued to investigate, monitor, and record data from the wells at issue and three other neighboring wells from 2005 into the present. In 2005, the DWR installed water level monitoring equipment that over time allowed it to determine the degree of well-to-well interference between HS-003 and the five nearest water rights: 10,035, 10,467, 11,750, 19,032, and 25,275.

*The Lawsuit*

On May 1, 2012—seven years after Garetson filed its initial complaint with the DWR—Garetson filed the lawsuit now at issue, alleging impairment of senior water right HS-003 by water rights 10,467 and 25,275, then owned by Kelly and Diana Unruh. The Unruhs filed an answer on June 11, 2012, admitting they owned the two junior water rights but denying the allegations of the impairment. For whatever reason, and unbeknownst to Garetson and the district court, the Unruhs misrepresented their ownership of the water rights because in reality, they had sold the property and water rights to American Warrior on May 30, 2012—12 days prior to the filing of their answer. American Warrior's ownership was disclosed in August 2013. American Warrior was aware of the pending water right dispute when it purchased the property from the Unruhs.

On November 29, 2012, in a phone conference with the district court, Garetson and the Unruhs advised that they agreed to the appointment of the DWR as a fact-finder in the case pursuant to K.S.A. 82a-725. The district court appointed the DWR as the agreed-upon fact-finder, directed the DWR to submit a report to the court, and set the case for review in March 2013.

*The First Temporary Injunction*

The DWR filed its preliminary fact-finder report on April 3, 2013, and it was placed into evidence without objection. The district court granted Garetson's motion for a temporary injunction and ordered "the defendants (Unruh), their successors, their tenets [*sic*], and their agents . . . to refrain from pumping Well 10,467 and Well 25,257." The district court also joined Cecil O'Brate, owner and CEO of American Warrior, as a defendant. The Unruhs filed a motion to establish bond on June 3, 2013.

On July 11, 2013, numerous procedural motions were set for hearing. At this hearing, the Unruhs requested a continuance on their motion for bond, which the district court granted.

On August 5, 2013, Garetson filed an amended petition naming American Warrior and Rick Koehn, the tenant farming on American Warrior's land, as defendants. O'Brate was dismissed as an individual defendant, and the Unruhs were no longer named defendants. On October 14, 2013, Garetson transferred its senior water right to Foreland Real Estate, LLC (Foreland), who joined the lawsuit as a named plaintiff.

On November 3, 2013, the district court heard numerous motions and ultimately vacated the 2013 temporary injunction because the injunction had shut off the water supply to Koehn's crop and he had not received notice of the proceeding. Because the temporary injunction was vacated, the district court did not find a need to set bond. Additionally, the district court denied American Warrior's motion to dismiss for Garetson's alleged failure to exhaust its administrative remedies, holding that K.S.A. 82a-717a provided that any person with a vested water right may restrain or enjoin any diversion or proposed diversion that impairs a water right in any court of competent jurisdiction and that the statute did not require that one must first exhaust his or her administrative remedies to do so. The district court also ordered the DWR to continue as the court-appointed fact-finder and directed the DWR to continue to investigate and report any or all of the physical facts concerning the water rights referenced in this case pursuant to K.S.A. 82a-725. Specifically, that order stated:

> "The report shall set forth findings of fact in regard to the degree HS-003 is being impaired by water rights 10,467 and 25,257. The report shall set forth the opinions the [the DWR] regarding whether any such impairment . . . [is] a substantial impairment to HS-003. If [the DWR] concludes substantial impairment to HS-003 exists, [the DWR] shall advise as to recommended remedies to curtail the substantial impairment to HS-003 and explain why these remedies are recommended."

7

*The Second Temporary Injunction*

The DWR filed a second and final report on March 31, 2014. Subsequently, the district court considered Garetson's second motion for a temporary injunction and, on May 5, 2014, issued a temporary injunction, set a bond, and ordered American Warrior and its tenant to curtail use of water rights 10,467 and 25,257.

*Interlocutory Appeal to This Court*

American Warrior filed an interlocutory appeal, raising four issues:  (1) the admission of the DWR's report into evidence, (2) the consideration given to certain evidence presented by American Warrior, (3) the interpretation of "impair," and (4) the granting of the temporary injunction.

The panel hearing American Warrior's interlocutory appeal ultimately held that temporary injunctive relief was an appropriate remedy because under the circumstances the district court did not abuse its discretion by ordering American Warrior to stop pumping water from the junior wells during the pendency of the action. 51 Kan. App. 2d at 392. The panel also held that the DWR's report had been properly admitted into evidence and that the district court properly considered all of the evidence presented. 51 Kan. App. 2d at 386-87. Finally, the panel interpreted K.S.A. 82a-716 and K.S.A. 82a-717a, holding the Legislature did not give the word a special definition in the statute and, therefore, the district court used the proper definition of "impair." 51 Kan. App. 2d at 388-89.

*Trial and the Permanent Injunction*

After the temporary injunction was affirmed by another panel of this court, the district court held a three-day bench trial. Two witnesses testified for Garetson, including

the chief engineer who prepared the final DWR report. American Warrior called 11 witnesses, including Dr. Kenneth Rainwater, who has his Ph.D. in civil engineering with a specialty in water resources and environmental engineering. Koehn called two witnesses as well.

Dr. Rainwater did not challenge the factual and statistical data in DWR's report but disagreed with the interpretation of that data. He testified that he did not believe the report was scientifically reliable for numerous reasons. Although Dr. Rainwater accepted the DWR's drawdown tests at their face value and noted that the observed drawdown at HS-003 also included both drawdown in the aquifer as well as energy losses within the HS-003 well itself, Dr. Rainwater concluded HS-003's sizable drawdown was due to its own construction and aquifer limitations. Yet Dr. Rainwater could not provide any computations to determine amount of impairment by the alleged improper well construction, nor did he suggest an alternate equation for use by the DWR and did not state in his report how calculations should have been done.

After hearing all of the testimony, the district court made numerous findings of fact, which we will not recount completely here but will merely summarize the relevant findings. Importantly, the district court did not find Dr. Rainwater's testimony as credible as Garetson's evidence and the DWR's report. The district court found:

"While Dr. Rainwater's academic credentials are noteworthy, his testimony and opinions lacked the seasoning of someone with real life experience who is actively engaged in the field. The court was not persuaded the water well utilized by HS 003 was improperly constructed or a poor well site. The court found [another witness] to be a credible witness when he discussed drilling multiple dry holes, replacing the well bowls, and the type of screening used in the well. The court also noted Dr. Rainwater accepted [the DWR's] draw down tests at their face value, accepted [the DWR's] factual and statistical data, agreed [American Warrior's] water rights communicated with HS 003 and agreed when [American Warrior's] rights are in use they affect the ability to use HS 003."

9

The district court found that the rate of water extraction from the aquifer greatly exceeded the rate of recharge to the aquifer. Specifically, the aquifer has declined about 6 feet on average each year in this area for the last 5 years. The groundwater system in the area recharges somewhere in the range of 0.1 inch to 1.0 inch per year. The water replenishing the area of concern is less than 100 acre-feet per year compared with pumping that has been between 1,200 and 1,500 acre-feet per year in recent history for the six water rights studied in the DWR's report. The imbalance between the rate of recharge with the rate of pumping has led to substantial declines in groundwater levels over the decades, causing reduced well yields. Scientists with Kansas Geological Survey have found that, if recent practices continue, well operators in the area are facing the imminent end of the productive life of the isolated compartment of aquifer that they share.

Due to preirrigation season and early irrigation season pumping, HS-003 was not able to pump after July 1, 2013, despite the injunction placed on American Warrior's water rights in late May 2013. Even when American Warrior's water right 25,275 did not operate in 2013 and 10,467 did not operate after May 26, 2013, other neighboring water rights caused significant, and at times impairing, levels of drawdown at HS-003.

In November 2013, the DWR's step drawdown test found a maximum sustained pumping rate of 404 gallons per minute for HS-003. While HS-003 is authorized at the rate of 600 gallons per minute, the DWR does not believe 600 gallons per minute can be sustained in the current hydrologic setting.

When all neighboring water rights are operating, American Warrior's water rights account for about half of the impact to HS-003. Garetson's HS-003's total drawdown from the well is 49%; drawdown from American Warrior's 10,467 is 16% and from 25,275 is 7%. The three other neighboring rights, which are over twice the distance from HS-003, account for the other 28% of the drawdown. The DWR's final report found that

10

American Warrior's usage of its junior water rights is more immediately impactful on HS-003 because those water rights are closer to HS-003 than other neighboring water rights not owned by American Warrior. Since American Warrior's wells were shut off due to the temporary injunction, Garetson has been able to pump HS-003 longer and pump a higher quantity of water. Although the area has been severely dewatered, the DWR's report concluded that with careful regulation of use there may be sufficient remaining water supply to fulfill HS-003's water right and to provide a limited supply to one other neighborhood water rights.

The DWR concluded that American Warrior's water rights cannot operate without impairing water right HS-003. HS-003 is worse and weakened when American Warrior's water rights are operating. Specifically, the district court found: "The continued operation of [American Warrior's] water rights would lessen, diminish and weaken HS-003." Although the DWR concluded that Garetson's water right had been substantially impaired by American Warrior's water rights and the other neighboring water rights, HS-003 could ultimately be satisfied if the other wells in the neighborhood were not operating.

The district court found that Garetson had succeeded on the merits of its claim that its senior water right HS-003 was being impaired by an appropriator with a later priority of right—American Warrior—and issued the permanent injunction.

The DWR proposed two remedies to cure the impairment of HS-003. One remedy was to rotate which of the other water rights in the neighborhood was allowed to operate based on seniority and distance from HS-003. The second remedy was to protect and prolong HS-003's water right by curtailing all of the other water rights in the neighborhood. American Warrior countered that an injunction would not prevent the irreparable injury to HS-003 because Garetson still would not have enough water due to the drawdown caused by other neighboring water rights. Specifically, American Warrior

11

argued that because HS-003 will be impaired anyway, any impairment to water right HS-003 is not irreparable and the cessation of pumping from its water rights will not provide a remedy that will allow Garetson to realize the authorized rate and quantity of HS-003.

The district court held that although American Warrior may be correct that Garetson will not be able to realize the authorized rate and quantity of HS-003 even with the shutdown of American Warrior's water rights, the irreparable harm to Garetson still existed as its first-in-time water right is being depleted year after year as a result of ongoing impairment from American Warrior's less senior water rights. The district court further noted that injury resulting from American Warrior's impairment was still irreparable even if others are contributing to that impairment and that Garetson had the option to address the alleged impairment by other junior rights in the neighborhood in a separate action. The district court further held that the threatened injury to Garetson's senior water right outweighed any alleged damage the injunction could cause American Warrior, the injunction was not adverse to the public interest, and that an action at law would not provide Garetson an adequate remedy. Thus, the district court granted Garetson's motion for a permanent injunction and ordered American Warrior to discontinue utilizing its junior water rights, 10,467 and 25,275, due to the impairment to HS-003. However, the district court left the door open for a change of circumstances in the future and ordered: "This court does not wish to draft an order that would micro manage future use of no. 10,467 and no. 25,275. At an unknown future time [American Warrior's] rights may no longer impair HS-003. Should this unlikely event occur, the court trusts a procedure exists to address this situation in the [Kansas Water Appropriations Act]."

Finally, the district court addressed Koehn's request for damages from the first temporary injunction in 2013 that was withdrawn by the district court because Koehn was not properly notified of the injunction. Koehn obeyed the 2013 injunction and suffered loss as a result. The district court recognized that, generally, all defendants who have

12

been enjoined by an order wrongfully obtained, have obeyed the injunction, and who consequently suffered loss due to their obedience to the injunction, can claim and recover damages on a bond given for their protection. Nevertheless, the district court held that because no bond was ever set for the 2013 temporary injunction, and Koehn had failed to show malice in the obtaining of the injunction, damages could not be awarded. Koehn did not appeal that ruling.

*Current Appeal and Additional Background*

American Warrior has timely appealed the district court's permanent injunction. However, on July 1, 2017, while the time for American Warrior to file its brief was pending, amendments to the Kansas Water Appropriations Act, K.S.A. 82a-701 et seq. (KWAA), went into effect. Compare K.S.A. 82a-717a with K.S.A. 2017 Supp. 82a-717a. Just a few days later, on July 6, 2017, American Warrior filed a motion to dismiss its own appeal, arguing that the amendments to the KWAA divested this court of jurisdiction because the amendments allegedly retroactively required Garetson to exhaust its administrative remedies. On August 1, 2017, this court granted American Warrior's motion to dismiss, which in effect left the permanent injunction intact. American Warrior then sought to reinstate the appeal, which this court did on August 17, 2017.

*Analysis*

On appeal, American Warrior asserts ten points of error:

(1) The 2017 amendments to the KWAA divested this court and the district court of subject matter jurisdiction to hear this case.

(2) The district court erred in not dismissing the case for Garetson's alleged failure to exhaust administrative remedies.

13

(3)     The district court erred in appointing the DWR as fact-finder and referee as authorized by K.S.A. 82a-725; instead, the DWR's report should be subject to the expert evidentiary standards of K.S.A. 2017 Supp. 60-456.

(4)     The district court erred by allowing the DWR not to follow the proper procedures in preparation of its Final Report.

(5)     The district court did not properly define Garetson's water right.

(6)     The district court used an incorrect definition of "impairment" under the Act.

(7)     The district court erred in granting the permanent injunction when Garetson had "grossly over-appropriated" its water right.

(8)     The district court erred in not requiring the DWR to respond to the parties' objections to the Final Report and by refusing to rule prior to trial on the exceptions to the report filed by the parties.

(9)     The district court erred in refusing to dismiss the case based on Garetson's failure to join indispensable parties.

(10)    The district court erred by requiring Koehn to prove malice in order to be awarded damages for the first temporary injunction.


For clarity and to avoid redundancy, we have reorganized and reframed American Warrior's issues on appeal as follows:  First, American Warrior's first issue is addressed; second, American Warrior's second, third, fourth, seventh, and ninth issues are addressed together as one issue; third, American Warrior's fifth, sixth, and seventh issues are addressed as one issue; and fourth, American Warrior's tenth issue is addressed.


I.      DID THE 2017 AMENDMENTS TO THE KWAA DIVEST THE DISTRICT COURT—AND US—OF SUBJECT MATTER JURISDICTION?


First, American Warrior argues that neither we nor the district court have jurisdiction over this case. Specifically, American Warrior argues that the 2017

14

amendments to K.S.A. 82a-716 and K.S.A. 82a-717a now require a party to exhaust its administrative remedies before it may bring an action seeking injunctive relief in the district court, thus divesting the courts of jurisdiction over this case. These amendments became effective on July 1, 2017—five months after the district court entered the permanent injunction. Garetson argues that the doctrine of continuing jurisdiction applies and that because there was no requirement that it exhaust its administrative remedies when the district court entered its final order, both the district court and this court have jurisdiction.

Prior to July 1, 2017, K.S.A. 82a-716, the statute under which the district court granted the permanent injunction, read:

> "If any appropriation, or the construction and operation of authorized diversion works results in an injury to any common-law claimant, such person shall be entitled to due compensation in a suitable action at law against the appropriator for damages proved for any property taken. Any person with a valid water right or permit to divert and use water may restrain or enjoin in any court of competent jurisdiction a subsequent diversion by a common-law claimant without vested rights without first condemning those common-law rights. An appropriator shall have the right to injunctive relief to protect his or her prior right of beneficial use as against use by an appropriator with a later priority of right."

After July 1, 2017, K.S.A. 2017 Supp. 82a-716 read in its entirety:

> "If any appropriation, or the construction and operation of authorized diversion works results in an injury to any common-law claimant, such person shall be entitled to due compensation in a suitable action at law against the appropriator for damages proved for any property taken. Any person with a valid water right or permit to divert and use water may, *after first exhausting the remedies available under K.S.A. 82a-717a, and amendments thereto*, restrain or enjoin in any court of competent jurisdiction a subsequent diversion by a common-law claimant without vested rights without first

15

condemning those common-law rights. *After first exhausting the remedies available under K.S.A. 82a-717a, and amendments thereto*, an appropriator shall have the right to injunctive relief to protect his or her prior right of beneficial use as against use by an appropriator with a later priority of right." (Emphasis added.)

At the time the district court entered its final order, K.S.A. 82a-717a read in full:

"No common-law claimant without a vested right, or other person without a vested right, a prior appropriation right, or an earlier permit shall divert or threaten to divert water if such diversion or threatened diversion impairs or would impair any vested right, appropriation right, or right under a permit to appropriate water. But any common-law claimant with a vested right, or other person with a vested right, a prior appropriation right, or an earlier permit may divert water in accordance with any such right or permit although such diversion or use thereunder conflicts with the diversion, use, proposed diversion, or proposed use made or proposed by a common-law claimant who does not have a vested right, or other person who does not have a vested right, a prior appropriation right or an earlier permit. Moreover, any common-law claimant with a vested right, or other person with a vested right, a prior appropriation right, or an earlier permit may restrain or enjoin in any court of competent jurisdiction any diversion or proposed diversion that impairs or would impair such right in the event that any such diversion or proposed diversion is made or is threatened to be made by any common-law claimant, or other person who does not have a vested right, a prior appropriation right, or an earlier permit."

The 2017 amendments drastically altered K.S.A. 82a-717a; it now reads in full:

"(a) No common-law claimant without a vested right, or other person without a vested right, a prior appropriation right, or an earlier permit shall divert or threaten to divert water if such diversion or threatened diversion impairs or would impair any vested right, appropriation right, or right under a permit to appropriate water. But any common-law claimant with a vested right, or other person with a vested right, a prior appropriation right, or an earlier permit may divert water in accordance with any such right or permit although such diversion or use thereunder conflicts with the diversion, use, proposed

16

diversion, or proposed use made or proposed by a common-law claimant who does not have a vested right, or other person who does not have a vested right, a prior appropriation right or an earlier permit.

*"(b)(1) Any common-law claimant with a vested right, or other person with a vested right, a prior appropriation right, or an earlier permit may, in accordance with this subsection, obtain an order from the chief engineer that limits, curtails or prevents any diversion or proposed diversion that impairs or would impair such right in the event that any such diversion or proposed diversion is made or is threatened to be made by any common-law claimant, or other person who does not have a vested right, a prior appropriation right, or an earlier permit.*

(2) Any common-law claimant with a vested right, or other person with a vested right, a prior appropriation right, or an earlier permit who claims impairment of such right by any other person without a prior right to the same water *shall submit a complaint to the chief engineer in accordance with rules and regulations of the chief engineer.*

> *(A) Within two weeks of receiving a complaint of impairment, the chief engineer shall initiate an investigation of such complaint and provide notice of such investigation to the complainant and the allegedly impairing party or parties. As part of the investigation, the chief engineer shall provide an opportunity for the parties to submit any relevant information, including submission of an engineering study that meets standards designated by the chief engineer through rules and regulations.*

> *(B) Following the investigation, the chief engineer may issue an order, consistent with K.S.A. 82a-706b, and amendments thereto, and rules and regulations of the chief engineer, that limits, curtails or prevents the diversion and use of water by any person without a prior right to the same water or that otherwise disposes of the complaint.*

> *(C) The chief engineer shall complete any investigation initiated pursuant to this subsection within 12 months of the date the complaint was submitted to the chief engineer, provided that the chief engineer may extend the*

17

*investigation for good cause by notifying the parties in writing of the amount of time needed to complete the investigation.*

*(3) Concurrent with submission of a complaint under paragraph (2), or during the pendency of the chief engineer's investigation pursuant to the complaint, the complainant may petition the chief engineer to issue a temporary order, to be effective until a final order is issued under paragraph (2)(B), that limits, curtails or prevents the diversion and use of water by any person without a prior right to the same water upon a finding by the chief engineer that a substantial likelihood exists that impairment is occurring or will occur and that an order limiting, curtailing or preventing diversion and use of water by any person without a prior right to the same water would not be adverse to the public interest.*

*(4) Any order issued by the chief engineer pursuant to this subsection is subject to review in accordance with the Kansas judicial review act."* (Emphasis added.)

Clearly, the 2017 amendments to K.S.A. 82a-716 and K.S.A. 82a-717a that became effective on July 1, 2017—while this appeal was pending before us—require a litigant now to exhaust its administrative remedies with the DWR before seeking judicial review of the DWR's order. However, there was simply no such requirement when the district court entered its final order in this lawsuit. Therefore, we must determine if the 2017 amendments to K.S.A. 82a-716 and K.S.A. 82a-717a apply retroactively to divest the district court of subject matter jurisdiction after it entered its final order.

Whether a statute should be applied retroactively is an issue of statutory interpretation over which we exercise unlimited review. See *State v. Brownlee*, 302 Kan. 491, 508-09, 354 P.3d 525 (2015). Generally, a statute operates prospectively unless (1) its language clearly indicates the legislature's intent that it operate retroactively, or (2) the change is procedural or remedial in nature. *White v. State*, 308 Kan. 491, 499, 421 P.3d 718 (2018).

18

Here, there is no clear language reflected in the statute that the Legislature intended for it to operate retroactively, but the statute is procedural and not substantive because it regulates the process for having access to the district court to enforce one's senior vested water right. However, even procedural rules cannot be applied retroactively if they eradicate a vested or substantive right that is "'so fixed that it is not dependent on any future act, contingency or decision to make it more secure.'" *State v. Dupree*, 304 Kan. 43, 52, 371 P.3d 862 (2016) (quoting *Board of Greenwood County Comm'rs v. Nadel*, 228 Kan. 469, 474, 618 P.2d 778 [1980]).

A vested water right is a real property right. *Garetson*, 51 Kan. App. 2d at 381. There is no dispute in this case that Garetson has a vested water right under K.S.A. 2017 Supp. 82a-701(d), and that this right was awarded in 1950. Here, Garetson needs no additional decision or future act to make its vested water right more secure. Further, at the time this action was filed in 2012 until the entry of its final order, the district court held subject matter jurisdiction to enter this order. It was not until five months *after* the entry of the district court's final order in this case that the 2017 amendments went into effect. Under K.S.A. 82a-716 and K.S.A. 82a-717, Garetson was not required to exhaust administrative remedies at any point in time during the district court's jurisdiction over the case. Accordingly, at the time both the petition and the district court's final order in this action were filed, the district court had subject matter jurisdiction to issue the permanent injunction protecting Garetson's vested right.

Under the doctrine of continuing jurisdiction, once subject matter jurisdiction is acquired over a case, jurisdiction over that case continues and is not divested until all issues are resolved. *State ex rel. Owens v. Hodge*, 230 Kan. 804, 813, 641 P.2d 399 (1982); see also *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428, 111 S. Ct. 858, 112 L. Ed. 2d 951 (1991) ("We have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events."); *Farha v. Signal Companies, Inc.*, 216 Kan. 471, 478, 532 P.2d 1330 (1975)

19

("'Jurisdiction is not a light bulb which can be turned off or on during the course of the trial. Once a court acquires jurisdiction over an action it retains jurisdiction over that action throughout the proceeding.'"); *Walker v. McNutt*, 165 Kan. 533, 541, 196 P.2d 163 (1948) ("'It is a familiar principle that when a court of competent jurisdiction acquires jurisdiction of the subject matter of a case, its authority continues, subject only to the appellate authority.'").

American Warrior rests its divestiture of jurisdiction position, in part, on *Merryfield v. Kansas Dept. of SRS*, 43 Kan. App. 2d 1, 238 P.3d 743 (2009). However, that case does not involve the exhaustion of administrative remedies. Rather, in *Merryfield*, the petitioners sought review of their civil confinement under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. There, the Legislature amended the KJRA while the case was pending on appeal and completely exempted petitioners' claim from review under the KJRA under any circumstances. Stated differently, the amendment completely did away with the petitioners' cause of action. Because the petitioners' cause of action on appeal no longer existed under the KJRA, the claim was dismissed. The panel affirmed the district court's dismissal of the case, albeit for different grounds, without prejudice so the petitioners could refile the claims on another jurisdictional basis. 43 Kan. App. 2d at 2-3.

The situation in *Merryfield* is similar to another case on which American Warrior relies—*Amer. Foundries v. Tri-City Council*, 257 U.S. 184, 42 S. Ct. 72, 66 L. Ed. 189 (1921). In that case, after the district court entered an injunction and while the appeal was pending, the United States Congress passed the Clayton Act, which barred the type of injunction previously entered by the district court. As in *Merryfield*, because the petitioners' cause of action no longer existed, the United States Supreme Court remanded the case to the district court for modification of the decree consistent with the opinion. See 257 U.S. at 213.

20

Garetson agrees that an ongoing injunction is always susceptible to be dissolved based on changing circumstances or substantive changes in the law; yet those are not the facts presented in this case. See 42 Am. Jur. 2d, Injunctions § 287 (stating that an injunction is susceptible to modification or dissolution at any time, including after an appeal, based on a change in the law).

This case is more like *Jernigan v. State*, No. 114,529, 2016 WL 4736064 (2016), *aff'd in part and vac'd in part* 306 Kan. 1318 (2017). In that case, the petitioner was a physician who was served with a subpoena after the Board of Healing Arts lodged a complaint against him. Dr. Jernigan filed a petition in the district court requesting that it quash the subpoena issued by the Board under K.S.A. 65-2839a(b)(3). After the district court held a hearing but before the district court entered its decision, the 2014 amendments to K.S.A. 65-2839a(b)(3) became effective, requiring a person subpoenaed by the Board to exhaust his or her administrative remedies before seeking relief from the district court. See L. 2014, ch. 131, § 14. Before the amendment, exhaustion of administrative remedies was not required. See K.S.A. 65-2839a(b)(3).

The district court denied Jernigan's request to quash the subpoena. It found that the amendment should be applied retroactively because it was procedural in nature and, because Jernigan had not exhausted his administrative remedies, it lacked subject matter jurisdiction. But another panel of this court disagreed with the district court and, applying the doctrine of continuing jurisdiction, held that because the district court had jurisdiction when the petition was filed, a subsequent amendment requiring exhaustion of administrative remedies would not retroactively apply to strip the district court of subject matter jurisdiction. 2016 WL 4736064, at *4.

The case at hand is similar to *Jernigan*, yet the application of the doctrine of continuing jurisdiction is even more obvious in this case. Here, the district court had jurisdiction throughout the lawsuit's entire pendency in the district court while, in

21

*Jernigan*, the amendment requiring exhaustion of administrative remedies occurred while the case was still pending before the district court. Here, the district court without a doubt had subject matter jurisdiction when this case began and ended, and we will not retroactively strip the district court of such subject matter jurisdiction when there was no legislative intent to do so reflected in the statute. The district court had subject matter jurisdiction to enter its permanent injunction under the doctrine of continuing jurisdiction; therefore, this court also has jurisdiction to hear this appeal. See *Hodge*, 230 Kan. at 813.

II.      DO WE HAVE JURISDICTION OVER RULINGS NOT SPECIFIED IN THE NOTICE OF APPEAL?

American Warrior's brief raises several issues that relate to the district court's prior rulings throughout the case but were not included in the district court's permanent injunction decision. These arguments include:  (1) Did the district court err in not dismissing the case for Garetson's alleged failure to exhaust administrative remedies? (2) Did the district court err in appointing the DWR as fact-finder and referee as authorized by K.S.A. 82a-725? (3) Did the district court err in allegedly allowing the DWR to prepare its Final Report out of compliance with the DWR's procedures? (4) Did the district court err in not requiring the DWR to respond to the parties' objections to the Final Report and by refusing to rule prior to trial on the exceptions to the report filed by the parties? (5) Did the district court err in not dismissing the case based on Garetson's alleged failure to join indispensable parties?

Garetson argues we only have jurisdiction over the judgments identified by the notice of appeal. We agree. Whether jurisdiction exists is a question of law over which we exercise unlimited review. *In re Care & Treatment of Emerson*, 306 Kan. 30, 34, 392 P.3d 82 (2017).

American Warrior's notice of appeal reads in full:

"COMES NOW American Warrior, Inc. by and through Gerald O. Schultz and Zachary D. Schultz of Schultz Law Office, P.A. and gives notice of appeal to the Court of Appeals of the State of Kansas of the Permanent Injunction Decision filed with the Clerk of the District Court of Haskell County, Kansas on February 1, 2017.

"This is an appeal of right under K.S.A. 60-2102(a)(2) and 60-2102(a)(4)."

American Warrior's motions to dismiss the case because of Garetson's failure to exhaust its administrative remedies and its alleged failure to join indispensable parties were denied on December 2, 2013. By agreement of the parties, the DWR was appointed as fact-finder and referee as permitted by K.S.A. 82a-725 on November 29, 2012. Further, American Warrior's motion to strike the DWR as the fact-finder and referee in this case was also denied on December 2, 2013. Finally, American Warrior's objections to the district court's admission of the DWR's report on the grounds argued on appeal were denied in a pretrial order on October 17, 2016.

The right to appeal is entirely statutory and is not contained in the United States or Kansas Constitutions. *Wiechman v. Huddleston*, 304 Kan. 80, 86-87, 370 P.3d 1194 (2016). Subject to certain exceptions, Kansas appellate courts have jurisdiction to entertain an appeal only if the appeal is taken in the manner prescribed by law. 304 Kan. at 86-87.

K.S.A. 2017 Supp. 60-2103(b) requires: "The notice of appeal shall specify the parties taking the appeal; *shall designate the judgment or part thereof appealed from*, and shall name the appellate court to which the appeal is taken." (Emphasis added.) "'It is a fundamental proposition of Kansas appellate procedure that an appellate court only obtains jurisdiction over the rulings identified in the notice of appeal.'" *Associated Wholesale Grocers, Inc. v. Americold Corporation*, 293 Kan. 633, 637, 270 P.3d 1074

23

(2011), *cert. denied* 568 U.S. 928 (2012); *In re N.U.*, 52 Kan. App. 2d 561, 567, 369 P.3d 984 (2016).

In criminal cases, the Kansas Supreme Court has given a very liberal construction to notices of appeal. For example, in *State v. Wilkins*, 269 Kan. 256, 7 P.3d 252 (2000), Wilkins' notice of appeal indicated he was appealing from the "'judgment of sentence.'" Before the Supreme Court, Wilkins argued that the notice of appeal should have read "judgment *and* sentence," that the word "'of'" was a typographical error, and that the appellate file showed that it was always his intention to challenge the judgment rather than his sentence. The Supreme Court held it had jurisdiction to consider Wilkins' argument, finding that the notice of appeal "'should not be overly technical or detailed,'" did not prejudice the State, and encompassed the substantive trial issues Wilkins raised in his brief on appeal. 269 Kan. at 270.

Recently in *State v. Rocheleau*, 307 Kan. 761, 763, 415 P.3d 422 (2018), the Kansas Supreme Court considered whether Rocheleau's notice of appeal was "fatally flawed" when it only stated he was appealing his sentence but in his brief argued that his lifetime registration requirement under the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 et seq., was unconstitutional. At the time of Rocheleau's appeal, there was conflicting caselaw as to whether KORA registration requirements were part of a defendant's sentence. Our Supreme Court has recently resolved that conflict by declaring that KORA registration was not a part of a sentencing appeal. See *State v. Marinelli*, 307 Kan. 768, 790-91, 415 P.3d 405 (2018). The Supreme Court held that, given the conflicting caselaw, Rocheleau simply listing he was appealing from his sentence was sufficient to give the court appellate jurisdiction but warned post-*Marinelli* appellants pursuing KORA challenges "not to recite in the notice of appeal that the defendant is appealing only sentencing issues." *Rocheleau*, 307 Kan. at 762.

Criminal cases also focus on whether the State was prejudiced by the notice of appeal. For example, in *State v. Griffen*, 241 Kan. 68, 69, 734 P.2d 1089 (1987), the State argued that Griffen's notice of appeal, which stated that he was appealing from "his conviction and sentence," was insufficient to encompass his argument concerning the trial court's ruling on his motion to modify his sentence. The Supreme Court rejected this argument and held that there had been "no showing that the notice of appeal misled the State or that anyone was surprised or prejudiced by the issues on appeal." 241 Kan. at 70. And in *State v. Ransom*, 268 Kan. 653, 654-56, 999 P.2d 272 (2000), our Supreme Court held that the language "'from the judgment and sentence of the District Court of McPherson County, Kansas on November 6, 1997'" was sufficient to confer jurisdiction over the defendant's appeal of the district court's order certifying him to stand trial as an adult when there was only one issue to be appealed, both sides knew what that issue was, and the State could not have been prejudiced.

Kansas appellate courts have more strictly construed the notices of appeal in civil cases than in criminal cases. Nevertheless, the modern code of civil procedure was not designed to make the notice of appeal requirements more technical and burdensome, and a liberal construction is called for in order "to secure the just, speedy and inexpensive determination of every action and proceeding." K.S.A. 2017 Supp. 60-102; *Tullis v. Pittsburg State Univ.*, 28 Kan. App. 2d 347, 348-49, 16 P.3d 971 (2000). For example, in *Anderson v. Scheffler*, 242 Kan. 857, 858-61, 752 P.2d 667 (1988)—which involved two plaintiffs, James and Jacob—the Kansas Supreme Court considered whether the notice of appeal filed by Jacob conferred jurisdiction to consider the grant of summary judgment against James when the notice of appeal did not refer to James and the summary judgment decision did not affect James. Although the Supreme Court focused first on James' failure to file his own notice of appeal, it held that its review was limited to those rulings specified in the notice of appeal and it lacked jurisdiction because the notice of appeal filed by Jacob failed to specify that James was appealing the entry of summary judgment against him. 242 Kan. at 860-61.

25

Yet in *Key v. Hein, Ebert & Weir, Chtd.*, 265 Kan. 124, 129-30, 960 P.2d 746 (1998), the Kansas Supreme Court construed a civil notice of appeal to confer jurisdiction over all the issues raised on appeal when it was drafted by a pro se litigant and included "catch-all" language. Key's notice of appeal stated he was appealing from the December 19, 1996 order. An order granting Key's motion for summary judgment was issued in December 1995, and an order denying Key's motion to amend that decision was issued in December 1996. On appeal, the defendants argued that the notice of appeal failed to identify the trial court's order from December 1995.

In rejecting this argument, our Supreme Court noted a liberal construction of the notice of appeal was particularly appropriate because it was drafted by a pro se litigant. The Supreme Court held that the language "'grant[ing] the defendant Memorandum Decision order'" in the notice of appeal could be construed to include references to both the December 1995 and 1996 orders, and noted that the "catch-all" language in his notice of appeal—"'And from each and every order entered [contrary] to plaintiff'"— encompassed the 1995 summary judgment order, and found that the defendants had not been prejudiced by the notice of appeal. 265 Kan. at 129-30.

Although *Key* more liberally construed the notice of appeal to include the issues raised by the appellant on appeal, that case does not address the exact situation presented here. In this case, the notice of appeal specifies a particular judgment but does not contain any additional language that could include the trial court's other rulings. Additionally, the notice of appeal in this case was not drafted by a pro se litigant. Under the Supreme Court's reasoning in *Ransom*, 268 Kan. at 656, the notice of appeal in this case should be liberally construed to include all of the issues raised by American Warrior on appeal. However, *Ransom* is a criminal case and, as pointed out in *Tullis*, 28 Kan. App. 2d at 349, "there may be stronger public policy reasons for allowing criminal defendants more latitude in framing their appeals than parties in civil disputes."

26

Similar to the facts presented here is the case of *In re Marriage of Lay v. Sternadori*, No. 91,701, 2004 WL 2384238 (2004) (unpublished opinion). There, appellant's notice of appeal stated: "'Notice is hereby given that Appellant Rich Sternadori appeals the Division 8 Court's January 2, 2004 decision in the above case.'" 2004 WL 2384238, at *6. Applying the Supreme Court's decision in *Key*, the *Lay* panel determined that the liberal construction approach did not apply because the notice of appeal did not reference any earlier decisions by the district court nor did it contain any "catch-all" language. Therefore, the *Lay* panel determined it only had jurisdiction to address the issues in the January 2004 decision. 2004 WL 2384238, at *6. See also *Gates v. Goodyear*, 37 Kan. App. 2d 623, 627-29,155 P.3d 1196 (where notice of appeal referenced only specific order and did not contain "catch all" language, no appellate jurisdiction over issues outside referenced order), *rev. denied* 284 Kan. 945 (2007); *In re J.D.D.*, 21 Kan. App. 2d 871, 873, 908 P.2d 633 (1995) (appellate court jurisdiction limited to rulings specified in notice of appeal); *Raney-Neises v. HCA Health Service of Kansas, Inc.*, No. 93,740, 2006 WL 1460614, at *9 (Kan. App. 2006) (unpublished opinion) (same).

In the case at hand, Garetson does not claim it was prejudiced by the notice of appeal. However, in light of the above authority, we decline American Warrior's invitation to ignore K.S.A. 2017 Supp. 60-2103(b) and hold that American Warrior's notice of appeal is insufficient to confer jurisdiction on this court concerning the issues not addressed in the district court's permanent injunction order entered on February 1, 2017. We lack jurisdiction to consider American Warrior's five issues which were ruled upon prior to trial because there is no "catch-all" language in the notice of appeal to cover the additional rulings it argues were erroneous. Accordingly, those issues are dismissed.

27

III.    DID THE DISTRICT COURT ERR IN GRANTING THE PERMANENT INJUNCTION?

American Warrior also makes three specific arguments on appeal regarding the entry of the permanent injunction order: (1) The district court incorrectly defined Garetson's water right; (2) the district court used the incorrect definition of "impairment" under the Act; and (3) the district court erred in granting the permanent injunction when Garetson "grossly over-appropriated" its water right. As we see it, these three arguments can be distilled into one overarching issue: Did the district court err in granting the permanent injunction? Each specific argument will be addressed in turn.

A.      *Did the district court incorrectly define Garetson's water right?*

First, American Warrior argues the district court incorrectly defined Garetson's water right and, thus, the permanent injunction was improperly entered. Specifically, it argues that the district court did not consider water right 8,157, which shares a place of use and point of diversion with HS-003, when defining Garetson's water right.

Although American Warrior attempts to raise this issue as a matter of statutory interpretation under the Act, when the actual argument in its brief is examined, American Warrior is arguing that the district court was incorrect in finding that HS-003 was impaired by American Warrior. The finding that HS-003 was impaired is a factual finding by the district court, and this court reviews such factual findings for substantial competent evidence. See *Schoenholz v. Hinzman*, 295 Kan. 786, 792-93, 289 P.3d 1155 (2012). "Substantial competent evidence is such legal and relevant evidence as a reasonable person might regard as sufficient to support a conclusion." *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009).

Garetson's water right overlaps with its neighbor's water right 8,157 in place of use and point of diversion. An overlapping point of diversion means that all the water could

be taken out of either one or both wells simultaneously or exclusively up to the limits. Here, an overlapping place of use means that water use from both of the wells has been granted for use on Section 36.

American Warrior essentially asserts that because HS-003 overlaps with 8,157, HS-003 cannot be deemed impaired unless Garetson presented evidence that it cannot obtain HS-003's authorized rate or volume from the authorized point of diversion from the neighboring water right 8,157. American Warrior does not cite any legal support for this proposition.

The Moore family originally owned and controlled both HS-003 and 8,157. The DWR granted the family's request to overlap the point of diversion and the place of use of both water rights. This overlap allows the water authorized for HS-003 to be pulled from 8,157 and vice versa, and all of the combined water can be used on Section 36.

Garetson now owns the north half of Section 36 and Moore owns the south half. Garetson is currently in a year-to-year lease with Moore to farm the south half of Section 36. Jay Garetson testified that significantly more water is available from 8,157 than from HS-003. Accordingly, for the benefit of Moore, Garetson usually plants corn, which requires more water and is more profitable, on the south half of the section owned by Moore. Then, if additional water is available through HS-003, Garetson plants crops on the north half of Section 36 and uses HS-003 for irrigation.

American Warrior argues that the DWR and the district court should have considered that because HS-003 and 8,157 have an overlapping place of use and point of diversion, Garetson should be required to pull water from Moore's water right and use it on its own property. There are three problems with this argument.

29

First, each senior water right has an authorized rate of use and volume. Under the KWAA, if a junior water right is impairing the senior water right—preventing it from fulfilling its authorized rate or volume—the senior water right may bring a cause of action for an injunction. K.S.A. 82a-716 and K.S.A. 82a717a. American Warrior does not cite to any regulation, statute, or caselaw that mandates that an impaired senior water right is no longer impaired if the senior water right holder has permission to pull from a third party. "A failure to support an argument with pertinent authority or to show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief an issue. Therefore, an argument that is not supported with pertinent authority is deemed waived and abandoned." *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, Syl. ¶ 4, 294 P.3d 287 (2013).

Second, as a practical matter, Garetson is in a year-to-year lease with Moore to farm the south half of Section 36. If Garetson were to do as American Warrior proposes the law requires, albeit without support, and use all of Moore's water from 8,157 on Garetson's own land and for its own crop, it is likely the goodwill between Moore and Garetson would be spoiled and Moore could terminate the relationship. Further, it is speculation on the part of American Warrior that Garetson could use Moore's water however it chooses as Moore was not called to testify at trial and there was no evidence presented establishing that Garetson was free to use Moore's water right.

Third, American Warrior's argument asserts that even if Moore terminated the lease and refused to give Garetson permission, Garetson could continue to use 8,157 to compensate for any impairment of HS-003 by junior water rights. However, this would require Garetson to trespass onto Moore's property and take water from Moore's water right. American Warrior cites no support for this assertion, and nothing in the Act appears to give Garetson the ability to trespass onto another's property and utilize another water right to compensate for a senior water right's impairment by other junior water rights.

The district court's ruling is supported by substantial competent evidence.

B.    *Did the district court use the incorrect definition of "impairment" under the KWAA?*

Second, American Warrior argues that the permanent injunction is erroneous because the district court used the incorrect definition of "impairment" under the KWAA in its order. Specifically, American Warrior argues that the district court erred in using the definition of "impairment" approved of by the previous *Garetson* panel.

Resolution of this issue involves interpretation of a provision within the KWAA. "This court interprets the KWAA de novo just as it does all other statutes." *Clawson v. Kansas Dept. of Agriculture*, 49 Kan. App. 2d 789, 796, 315 P.3d 896 (2013).

The version of K.S.A. 82a-717a in effect at the time of the permanent injunction decision, states that "any common-law claimant with a vested right . . . may restrain or enjoin in any court of competent jurisdiction any diversion or proposed diversion that impairs . . . such right." K.S.A. 82a-716, the statute under which the district court issued the permanent injunction, does not provide a definition of "impairment." American Warrior invites us to examine K.S.A. 82a-711(c) again to form a definition of "impairment." K.S.A. 82a-711(c) reads, in part:

> "With regard to whether a proposed use will impair a use under an existing water right, impairment shall include the unreasonable raising or lowering of the static water level or the unreasonable increase or decrease of the streamflow or the unreasonable deterioration of the water quality at the water user's point of diversion beyond a reasonable economic limit."

The district court used the following definition of impairment:  "diminishes, weakens, or injures the prior right." American Warrior argues this was an incorrect definition and

31

suggests that we should borrow and add the language "beyond a reasonable economic limit" from K.S.A. 82a-711(c), read it into K.S.A. 82a-717a, and define "impairment" as diminishes, weakens, or injures the prior right beyond a reasonable economic limit.

The problem is that American Warrior previously raised this same argument in its interlocutory appeal before another panel of this court. See *Garetson*, 51 Kan. App. 2d at 387-89. That panel analyzed the issue as follows:

> "Specifically, [American Warrior] would have us interpret K.S.A. 82a-717a to mean that some impairment of a senior or vested water right by diversion is acceptable, so long as it is not 'beyond a reasonable economic limit'—a phrase found in K.S.A. 2014 Supp. 82a-711(c). In response, [Garetson] contends that it was appropriate for the district court to use the definition of the word 'impair' found in Black's Law Dictionary. Also, [Garetson] asserts that K.S.A. 2014 Supp. 82a-711 does not apply to the circumstances presented in this case.

> "We must first attempt to discern the legislature's intent through the language used in the statutes by giving common words their ordinary meanings. As a general rule, we employ the canons of statutory construction only when the language is ambiguous. When statutory language is plain and unambiguous, we are not to speculate as to legislative intent. Likewise, we are not to read into the statutes words not readily found there. *In re A.M.M.-H.*, 300 Kan. at 535.

> "Both K.S.A. 82a-716 and K.S.A. 82a-717a afford prior senior water right holders the right to seek injunctive relief against a junior water right holder who is diverting water from the same source. See *Williams*, 190 Kan. at 335. But [American Warrior] does not even mention K.S.A. 82a-716 in its brief. This is significant for several reasons. First, the district court relied upon K.S.A. 82a-716—not K.S.A. 82a-717a—in granting the temporary injunction in this case. Second, the word 'impair' is not used in K.S.A. 82a-716. Third, like K.S.A. 82a-717a, the phrase 'beyond a reasonable economic limit' is not found in K.S.A. 82a-716.

"In its decision granting the temporary injunction, the district court expressly found that K.S.A. 82a-716 'clearly provides authority for [Garetson] to request a temporary injunction to protect [its] first in time water right.' [American Warrior's] failure to brief the court on this statute or otherwise argue that the district court inappropriately applied the statute here arguably results in AWI's abandonment of this issue, meaning it is not properly before us. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011). Nonetheless, K.S.A. 82a-716 provides—in part—that a senior water right holder 'shall have the right to injunctive relief to protect his or her prior right of beneficial use as against use by an appropriator with a later priority of right.' We do not find this language to be either unclear or ambiguous.

"Even if the district court had relied upon K.S.A. 82a-717a in granting the temporary injunction in this case, we do not find the word 'impair' to be unclear or ambiguous. The common definition of the word 'impair' is 'to cause to diminish, as in strength, value, or quality.' The American Heritage Dictionary 878 (4th ed. 2006). This definition is similar to the definition of impair used by the district court, which looked to Black's Law Dictionary 752 (6th ed. 1990) to define 'impair' to mean 'to weaken, to make worse, to lessen in power, diminish, or relax or otherwise affect in an injurious manner.' See *Humana Inc. v. Forsyth*, 525 U.S. 299, 309-10, 119 S. Ct. 710, 142 L. Ed. 2d 753 (1999). Thus, using the ordinary definition of impair, we conclude that the legislature intended that the holder of a senior water right may seek injunctive relief to protect against a diversion of water by a holder of a junior water right when that diversion diminishes, weakens, or injures the prior right.

"Because K.S.A. 82a-717a is clear and unambiguous, we decline [American Warrior's] invitation to add the 'beyond a reasonable economic limit' language used in K.S.A. 2014 Supp. 82a-711(c). Had the legislature desired to give the word 'impair' a special definition, it could have done so either by adding the definition to the text of K.S.A. 82a-717a or including it in the definition section of the [Act] located in K.S.A. 2014 Supp. 82a-701. However, it chose not to do so. Thus, we decline [American Warrior's] invitation to read additional language into the statute." 51 Kan. App. 2d at 388-89.

Although neither party addresses this point on appeal,

> "[t]he doctrine of law of the case prevents a party from serially litigating an issue already presented and decided on appeal in the same proceeding. The doctrine promotes judicial efficiency while allowing litigants a full and fair opportunity to present their arguments on a point—the first bite of the proverbial apple." *State v. Parry*, 51 Kan. App. 2d 928, 928, 358 P.3d 101 (2015), *aff'd* 305 Kan. 1189, 390 P.3d 879 (2017).

"[O]nce an issue is decided by the [appellate] court, it should not be relitigated or reconsidered unless it is clearly erroneous or would cause manifest injustice." *State v. Collier*, 263 Kan. 629, Syl. ¶ 3, 952 P.2d 1326 (1998).

This issue has already been litigated before us. See *Garetson*, 51 Kan. App. 2d at 387-89. In the present case, American Warrior does not claim that the holding was clearly erroneous or that its application would result in manifest injustice. Although American Warrior does make arguments as to why the prior decision was incorrect, a review of American Warrior's brief in its prior appeal reveals the arguments here are the same as those it initially advanced and were rejected in its first appeal. In fact, the analysis section in both briefs is verbatim. The law of the case doctrine applies here, and the district court did not err in using the definition of "impair" and "impairment" approved by this court in the prior appeal.

C.    *Did the district court err in granting the permanent injunction when Garetson allegedly "grossly over-appropriated" its water right?*

Third, American Warrior argues that the permanent injunction was improperly granted because Garetson "grossly over-appropriated" its water right and, therefore, has unclean hands.

34

"The clean hands doctrine is based upon the maxim of equity that he who comes into equity must come with clean hands." *Fuqua v. Hanson*, 222 Kan. 653, Syl. ¶ 3, 567 P.2d 862 (1977). The application of the doctrine of clean hands is reviewed for abuse of discretion. See 222 Kan. at 657. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *Gannon v. State*, 305 Kan. 850, 868, 390 P.3d 461 (2017).

In substance the clean hands doctrine provides that

"no person can obtain affirmative relief in equity with respect to a transaction in which he has, himself, been guilty of inequitable conduct. It is difficult to formulate a general statement as to what will amount to unclean hands other than to state it is conduct which the court regards as inequitable. Like other doctrines of equity, the clean hands maxim is not a binding rule, but is to be applied in the sound discretion of the court. The clean hands doctrine has been recognized in many Kansas cases. The application of the clean hands doctrine is subject to certain limitations. Conduct which will render a party's hands unclean so as to deny him access to a court of equity must be willful conduct which is fraudulent, illegal or unconscionable. Furthermore the objectionable misconduct must bear an immediate relation to the subject-matter of the suit and in some measure affect the equitable relations subsisting between the parties to the litigation and arising out of the transaction. Stated in another way the misconduct which may justify a denial of equitable relief must be related misconduct rather than collateral misconduct arising outside the specific transaction which is the subject-matter of the litigation before the court.

"It should also be emphasized that in applying the clean hands maxim, courts are concerned primarily with their own integrity. The doctrine of unclean hands is derived from the unwillingness of a court to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge. It

35

has nothing to do with the rights or liabilities of the parties. In applying the unclean hands doctrine, courts act for their own protection, and not as a matter of 'defense' to the defendant. [Citations omitted.]" *Green v. Higgins*, 217 Kan. 217, 220-21, 535 P.2d 446 (1975).

Here, the district court specifically considered the doctrine of clean hands and held that it was not applicable in this case. The district court stated:

> "The clean hands doctrine does not bar the plaintiff from obtaining an equitable injunction against the defendant for impairment of their senior water right. The court does not find the conduct of plaintiff was willful conduct that is fraudulent, illegal or unconscionable, nor does it shock the moral sensibilities of the court. The doctrine of clean hands does not bar Plaintiff from the relief sought."

American Warrior argues that Garetson over-appropriated HS-003 more than half of the years since 1955 and, therefore, acted illegally. However, the historic well records were not based on just HS-003 but also on water right 8,157, another water right which has an overlapping place of use and point of diversion with HS-003. When HS-003's volume limit of 240 acre-feet is combined with 8,157's volume limit of 960 acre-feet, the total volume limit is 1,200 acre-feet per year. When using the combined water rights total volume limit (because they share a place of access and point of diversion) those combined water rights have exceeded their permitted total volume limit only twice from 1955 through 2015. Moreover, American Warrior's expert confirmed that there was no evidence the wells were actually metered when there was alleged over-appropriation of the water right, so it is unknown if the early readings were accurate.

Notably, while American Warrior carries the burden to show an abuse of discretion, see *Gannon*, 305 Kan. at 868, it fails to assert exactly how the district court abused its discretion. We find no abuse of discretion when the district court declined to apply the doctrine of clean hands. The district court's ruling is supported by substantial

36

competent evidence, the district court applied the correct definition of "impairment," and the doctrine of clean hands does not apply. Therefore, the district court did not err in entering the permanent injunction.

IV. DID THE DISTRICT COURT ERR BY REQUIRING KOEHN TO PROVE MALICE IN ORDER TO BE AWARDED DAMAGES FOR THE FIRST TEMPORARY INJUNCTION?

Finally, American Warrior argues that the district court erred by requiring it to prove malice in order to be awarded damages for the original wrongfully-issued temporary injunction.

As previously discussed, the district court entered the 2013 temporary injunction on May 22, 2013. Thereafter, the Unruhs filed a motion seeking a bond on June 3, 2013. The motion was set for hearing on July 11, 2013, at which the Unruhs requested and the district court granted a continuance. The Unruhs were later removed from the case in August through the filing of an amended petition because they no longer owned the land in question. Subsequently, Koehn filed a motion to establish a bond on September 9, 2013, along with a motion to vacate the temporary injunction. Multiple motions were heard on November 5, 2013, and a decision to vacate the injunction was filed November 26, 2013. In the midst of multiple changes of counsel, the addition of multiple parties, the assignment of the case to three different judges, and the dismissal of the 2013 injunction, a bond ultimately was never set in regard to the 2013 injunction.

Before the district court, Koehn counterclaimed for damages from the entry of the 2013 temporary injunction—ultimately withdrawn by the district court—because he was not properly notified of the injunction. The district court held that because no bond was ever set for the 2013 temporary injunction and Koehn showed no malice on Garetson's part in obtaining the injunction, damages could not be awarded.

37

The fatal flaw in American Warrior's argument—and one that American Warrior fails to address on appeal—is that Koehn never filed a notice of appeal in this case. The only notice of appeal contained in the record on appeal was filed by American Warrior. A notice of appeal must specify the parties taking the appeal. See *Walker v. Regehr*, 41 Kan. App. 2d 352, 354, 202 P.3d 712, *rev. denied* 289 Kan. 1286 (2009). The party taking the appeal must be directly named or named by inference. See *Anderson*, 242 Kan. at 861. There is no mention in American Warrior's notice of appeal that Koehn is joining the appeal. American Warrior and Koehn have been represented by different counsel and have filed separate motions and other such filings with the district court throughout the course of this litigation. In addition, Koehn called his own witnesses and presented his own exhibits at trial. Therefore, Koehn is not a party to this appeal, and American Warrior lacks standing to argue Koehn's alleged error on appeal. We have no jurisdiction to consider this issue and it is therefore dismissed.

Affirmed in part and dismissed in part.